Robert E. Kurzius, Inc., et al., Appellants, v Incorporated Village of Upper Brookville, Respondent.

Second Department, March 26, 1979

## APPEARANCES OF COUNSEL

*Farrell, Fritz, Caemmerer & Cleary, P. C. (John M. Armentano* and *Robert V. Guido* of counsel), for appellants.

*Sprague, Dwyer, Aspland & Tobin, P. C. (Joseph L. Tobin, Jr.,* of counsel), for respondent.

## OPINION OF THE COURT

SHAPIRO, J.

This appeal involves, among other issues, the constitutional validity of a zoning ordinance of the defendant Incorporated Village of Upper Brookville (hereinafter village). Except for a small area along Route 25-A zoned for business, the remainder of the land in the village was zoned for single homes with a minimum lot size of at least two acres in some portions of the village and of at least five acres in the other portions. The plaintiffs are the owners of approximately 50 acres of land which are located within the five-acre minimum lot zone. They attack the zoning of this land on a number of grounds. In our opinion the sole ground which calls for extended consideration is their contention that the five-acre minimum lot zoning is constitutionally invalid. We agree with that contention.

### THE FACTS

The village is located in the Town of Oyster Bay. Shortly after its incorporation it adopted a building zone ordinance covering the entire village. That ordinance restricted single-family dwellings to two-acre minimum lots. In 1951 a small part of the village, an area along Route 25-A, was zoned for business. In April, 1959 the village retained Francis Dowd McHugh, an architect specializing in urban and community development, to make a study of the village's zoning and

planning. His studies showed that the area of the village totaled 2,737 acres or approximately four and one-quarter square miles. He testified that when he embarked on his study the village was semirural and largely open. There were then some residences located in several places in the village which were on lots less than two acres in size. There were other residences which were located on lots of from two to five acres. There were several farm areas and some residences with five acres or more of land. The commercial area consisted of only two or three properties. He also testified that the estimated population of the village at the time of his study in 1959 was 900 and that the 1960 census showed a population of slightly more than 1,000. In January, 1976 the population of the village was 1,232. *The witness testified further that on the basis of his study it was his opinion that the village could accommodate a population of about 3,500.*

After being retained by the trustees and the planning board of the village, McHugh had several meetings with them which he described as "constant informal meetings". At one meeting, held on November 30, 1959, he noted that 500 acres in the village were then vacant, and 2,200 acres were used residentially, of which 1,260 were of a "farm and estate character". He then proposed that 1,260 acres be zoned with a two-acre minimum and that the balance be zoned with 5, 10 and 20-acre minimums. The minutes of the meeting reveal that four of the trustees had misgivings as to a 20-acre minimum residential unit surviving a court test. The minutes also indicate that the chairman of the planning board and the mayor of the village "stressed the importance of consulting the large landowners to give them opportunity to express their views and position on any such proposals."

The witness then testified that thereafter he and the mayor, and "usually" the chairman of the planning board, met with some of those landowners (naming three of them) who owned considerable acreage in the village. These meetings were arranged by either the mayor or the chairman of the planning board and were held separately with each of the large landowners. The witness testified that he had not changed his mind concerning the 2, 5, 10 and 20-acre minimums he had proposed but that the people with whom he was meeting "changed their desires to the various types of density."

McHugh also testified that at later meetings the village officials finally decided that the 10 and 20-acre proposal was

"too ambitious" and adjusted it to 8 acres. This was confirmed by the minutes of the meeting of the planning board and board of trustees held on March 13, 1960. At a later meeting of the planning board held on May 11, 1960, it was decided to take no formal steps towards the adoption of the plan proposed by the witness "until further opportunity for study and conference with property owners whose substantial property interests were at stake and upon whose cooperation the Village Board desires to rely." After the May 11 meeting the board of trustees of the village and the planning board announced that a public meeting on the subject would be held on June 15, 1960. The letter announcing the meeting noted that since World War II the village's population had increased to 500 by 1950, had doubled since 1950, that the village was continuing to grow and that if the present two-acre minimum lot zoning prevailed with respect to the entire village it could expect to have an ultimate population of approximately 3,500. The letter also stated that *the mass majority of the residents would like to see the Village stay exactly as it is."* Under the heading "How Are These Aims To Be Achieved?" the letter stated that this could be done, "[b]y maintaining the present two-acre minimum in * * * [those] sections of the Village which best lend themselves to further development, and by raising the minimum acreage requirement in the least developed and most beautiful areas which at the same time because of their rugged contour are the least appropriate for close development." The letter continued that "It is the belief of the trustees, the Planning Board and our two professional consultants, that the above zoning is about the minimum which can be expected to preserve the rural aspect of the Village as we now know it. *It envisages a probable total population of 1,850 people."*

The zoning ordinance which was finally adopted by the village on December 11, 1960 established the following criteria for placing property in a two-acre zone:

"(a) Adjacent areas (of Upper Brookville and a neighboring village) are now so developed or subdivided;

"(b) Topography generally is under 5% slope, without major watercourse, and not necessarily wooded, but is suitable for such development;

"(c) Access (via existing County or State road) is most convenient to the Long Island and the Oyster Bay Expressways; and

"(d) Adjacent areas are now more open uses or they may be retained as 'Reservation' type of use in order to ensure permanent open space for such close development."

The ordinance also established these somewhat different criteria for placing property in the five-acre minimum lot zone:

"(a) Topography generally is rolling; or with slopes over 5% but also with relatively flat plateau suitable for dwelling and farming; wooded areas of native trees and watercourses also are prominent natural features;

"(b) Existing uses are of the same general character, or presently larger estates may suitably be utilized for Suburban estate purposes in future;

"(c) Adjacent areas (within the Village and along its peripheries) generally have similar character, or such areas are now or may reasonably be expected to become permanent open uses; and

"(d) Access to railroad and highway is generally less convenient."

The new five-acre minimum lot zone was called "OP-1" or "Suburban Estate". The ordinance described these terms in the following language: "A modest estate with plots of at least 5 acres per single family dwelling. Generally, such uses are deemed the most desirable and appropriate use of land in the north and central portions of the Village. As shown on the plan map, Suburban Estates also are deemed desirable and appropriate in the following parts of the Village: east of Mill River Road; north of Remsens Lane; and along both Wolver Hollow and Matinecock-Brookville Roads."

In 1968 the corporate plaintiff purchased a parcel of 60 acres in the village. The parcel was then a farm. Ten acres of the parcel were located within the two-acre minimum lot zone and the remaining 50 acres were located within the five-acre OP-1 minimum lot zone. The corporate plaintiff constructed two residences on five-acre plots in the OP-1 portion of the parcel in 1968, one for the use of the individual plaintiffs, Robert and Annemarie Kurzius, and the other for Robert's parents. Robert's father has since died and that home is now owned by his mother, Adele Kurzius, the third individual plaintiff. Title to each of these houses was conveyed to the individual plaintiffs in 1970. The corporate plaintiff also secured subdivision approval for five two-acre lots on the two-

acre minimum lot portion of the parcel and for nine five-acre lots on the remaining portion. The corporate plaintiff then partially improved all of the lots by providing drainage for them and constructing roads. Thereafter the corporate plaintiff constructed and sold five houses on the two-acre minimum lot portion of the parcel.

In April, 1974 the plaintiffs brought this declaratory judgment action seeking a ruling that the five-acre zoning ordinance was unconstitutional.

At the trial, the plaintiffs attacked the ordinance on the ground that it had been adopted in disregard of the comprehensive master plan adopted by the village on October 11, 1960, two months prior to the adoption of the ordinance. A second ground of attack was that the plaintiffs' property had been improperly classified under the standards established in the ordinance for two-acre minimum lot and five-acre minimum lot zones in that its topography did not conform to the requirements for the OP-1 zone, that is, it was not rolling, did not have a slope of over 5%, was not wooded and had no watercourse. Plaintiffs also submitted evidence to support their claim that they were unable to sell any of the five-acre lots contained in the 50 acres in that zone and that, therefore, the ordinance was confiscatory as applied to those 50 acres. Plaintiffs' final argument was that the ordinance, insofar as it imposed five-acre minimum lot zoning on a portion of their property, was an abuse of the police power since it did not serve the public welfare nor meet the standards contained in sections 7-700 and 7-704 of the Village Law and that therefore it was unconstitutional.

Section 7-700 of the Village Law provides in relevant part:

"Grant of power.

"For the purpose of promoting the health, safety, morals, or the general welfare of the community, the board of trustees of a village is hereby empowered, by local law, to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

Section 7-704 provides:

"Purposes in view.

"Such regulations shall be made in accordance with a

comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic, floods and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population, to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality."

### ZONING AND EXERCISE OF THE POLICE POWER

It is our view that the only ground which requires consideration is the one which attacks the five-acre zoning as arbitrary and unreasonable because it has no substantial relation to the public health, safety, morals or general welfare.

In *Berenson v Town of New Castle* (38 NY2d 102, 107) the Court of Appeals pointed out that the Legislature authorized local boards, " '[f]or the purpose of promoting the health, safety, morals, or the general welfare of the community,' to adopt zoning ordinances regulating and restricting, among other things, 'the height, number of stories and size of buildings and other structures,' the size of building lots and the over-all population density. (Town Law, § 281.)" [Section 7-700 of the Village Law tracks the language of the Town Law quoted above and as to density, declares that the board of trustees of a village is empowered by local law, to regulate "the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes".] The court in *Berenson* then said (p 107): "Zoning ordinances are susceptible to constitutional challenge only if 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' *(Euclid v Ambler Co.,* 272 US 365, 395; *Matter of Diocese of Rochester v Planning Bd. of Town of Brighton,* 1 NY2d 508, 522.)* Thus, it necessarily follows that the validity of a zoning ordinance depends on the facts of the particular case and whether it is 'really designed to accomplish a legitimate public purpose.' *(Matter of Wulfsohn v Burden,* 241 NY 288, 299.)"

In *Berenson* the Court of Appeals had to determine the

propriety, under the above standard, of a zoning ordinance which entirely barred multiple dwellings from a community. Before dealing with that problem, the court said (p 108): "In 1959, we sustained the validity of a village minimum lot requirement. *(Levitt v Incorporated Vil. of Sands Point,* 6 NY2d 269.) The court ruled that a reasonableness requirement was satisfied since the village was in an 'isolated geographical position in a fringe area on the northern tip of a peninsula'. Moreover, the district itself consisted of 'rolling and partly wooded land in an attractive *rural* residential community.' (6 NY2d, at p 272 [emphasis in original].)" It then stressed the limited impact of that holding (p 108): "We stated that the enactment of a two-acre minimum lot requirement might, in an *appropriate* case, be a legitimate exercise of the police power. Significantly, the lot size requirement did not extend throughout the village itself, but only applied within one residential district." (Emphasis supplied.) The *Berenson* court also said that while it had ruled in *Matter of Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, 376, app dsmd 409 US 1003) that a town may adopt a program providing for phased growth, "we were careful to note that 'community efforts at immunization or exclusion' would not be countenanced."

The Court of Appeals further declared in *Berenson* (pp 108-109): "New York is not the only urban State to confront the issue presented here. As in our own State, however, the results have been mixed. The Supreme Courts of Pennsylvania and New Jersey have struck down exclusionary zoning ordinances. *(Appeal of Girsh,* 437 Pa 237; *Southern Burlington County NAACP v Township of Mount Laurel,* 67 NJ 151, app dsmd 423 US 808.)* A Michigan court has taken a similar position *(Bristow v City of Woodhaven,* 35 Mich App 205, 218-219.)* The New Jersey and Pennsylvania cases involved minimum lot requirements, similar to the New Castle ordinance, whereas the Michigan case involved a prohibition on the use of mobile homes. On the other hand, in three States, it has been held permissible to exclude business structures from the community where adequate commercial services may be readily obtained in nearby communities. *(Valley View Vil. v Proffett,* 221 F2d 412 [STEWART, J.] [case involved a zoning ordinance of an Ohio village]; *Cadoux v Planning & Zoning Comm. of Town of Weston,* 162 Conn 425, cert den 408 US 924; *McDermott v Village of Calverton Park,* 454 SW2d 577

[Mo].) In one Federal case, the court sustained the validity of New Hampshire village's minimum acreage requirement, at least as a temporary measure. *(Steel Hill Development v Town of Sanbornton,* 469 F2d 956, 962.) Florida courts have upheld the validity of exclusionary zoning · provisions without any qualifications. *(Blank v Town of Lake Clarke Shores,* 161 So 2d 683 [Fla]; *Gautier v Town of Jupiter Is.,* 142 So 2d 321 [Fla].)" By including among the cases it cited on the issue of exclusionary zoning those which involved minimum lot requirements the *Berenson* court recognized that the use of minimum lot requirements in zoning ordinances might well involve exclusionary practices.

The court also dealt with a second aspect of the application of the police power to zoning ordinances when it said that in enacting a zoning ordinance, "consideration must be given to regional· needs and requirements." In discussing such needs and requirements it noted (p 110): "There must be a balancing of the local desire to maintain the *status quo* within the community *and the greater public interest that regional needs be met"* (emphasis supplied). The court in *Berenson* concluded its discussion of the need of zoning ordinances to "foster the development of programs designed to achieve sound regional planning" with the following trenchant statement (p 111): "While the people of New Castle may fervently desire to be left alone by the forces of change, the ultimate determination is not solely theirs. Whether New Castle should be permitted to exclude high density residential development depends on the facts and circumstances present in the town and the community at large. Until the day comes when regional, rather than local, governmental units can make such determinations, the courts must assess the reasonableness of what the locality has done."

 An examination of the testimony of the planning expert retained by the village in the instant case to draw up a comprehensive plan and to set up various minimum lot zoning districts makes it clear that the decision to create the five-acre minimum lot zoning area, added by the 1960 amendment to the zoning ordinance, reflected the desire of those responsible for that ordinance "to be left alone by the forces of change" and thereby to exclude from a large part of the village anyone who could not afford to purchase a minimum of five acres and build a home appropriate for such a large lot. In this connection it is noteworthy that the term used by the village for

residences located on two-acre minimum lots is "close development."

The decision in *Berenson v Town of New Castle* (38 NY2d 102, *supra)* was foreshadowed by *Matter of Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, 369, *supra).* In that case the court dealt with an attempt to use the zoning power "to provide an over-all program of orderly growth and adequate facilities through a sequential development policy commensurate with progressing availability and capacity of public facilities." The court rejected as "antiquated" the notion that "the regulation of land use and development is uniquely a function of local government—that the public interest of the State is exhausted once its political subdivisions have been delegated the authority to zone." The court said (p 374): "Experience, over the last quarter century, however, with greater technological integration and drastic shifts in population distribution has pointed up serious defects and community autonomy in land use controls has come under increasing attack by legal commentators, and students of urban problems alike because of its pronounced insularism and its correlative role in producing distortions in metropolitan growth patterns, and perhaps more importantly, in crippling efforts toward regional and State-wide problem solving, be it pollution, decent housing, or public transportation (ALI, A Model Land Development Code [Tent. Draft No. 2, April 24, 1970], Intro. Mem., p. xv, citing Report of National Comm. on Urban Problems [Douglas Comm.], Building the American City [1969]; see, also, New York State Planning Law Revision Study, Study Doc. No. 4 [New York State Office of Planning Coordination, Feb., 1970])."

The court went on to say (p 375): "There is, then, something inherently suspect in a scheme which, apart from its professed purposes, effects a restriction upon the free mobility of a people until sometime in the future when projected facilities are available to meet increased demands. Although zoning must include schemes designed to allow municipalities to more effectively contend with the increased demands of evolving and growing communities, under its guise, townships have been wont to try their hand at an array of exclusionary devices in the hope of avoiding the very burden which growth must inevitably bring (see *National Land & Inv. Co. v Easttown Twp. Bd. of Adj.,* 419 Pa. 504, 532, *supra; Girsh Appeal,* 437 Pa. 237; *Concord Twp. Appeal,* 439 Pa. 466, *supra;* see,

also, Roberts, Demise of Property Law, 57 Cornell L. Rev. 1, 5)."

Also noteworthy are the following comments in *Golden* (pp 377-379):

"It is the nature of all land use and development regulations to circumscribe the course of growth within a particular town or district and to that extent such restrictions invariably impede the forces of natural growth *(Euclid v Ambler Co.,* 272 U. S. 265, *supra; National Land & Inv. Co. v Easttown Twp. Bd. of Adj.,* 419 Pa. 504, 532, *supra).* Where those restrictions upon the beneficial use and enjoyment of land are necessary to promote the ultimate good of the community and are within the bounds of reason, they have been sustained. *'Zoning [,however,] is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future'* (*National Land & Inv. Co. v Easttown Twp. Bd. of Adj.,* 419 Pa. 504, 528, *supra).* Its exercise assumes that development shall not stop at the community's threshold, but only that whatever growth there may be shall proceed along a predetermined course *(Euclid v Ambler Co.,* 272 U.S. 365, 387, *supra).* It is inextricably bound to the dynamics of community life and its function is to guide, not to isolate or facilitate efforts at avoiding the ordinary incidents of growth. *What segregates permissible from impermissible restrictions, depends in the final analysis upon the purpose of restrictions and their impact in terms of both the community and general public interest* (see *Euclid v Ambler Co.,* 272 U.S. 365, 387, *supra).* The line of delineation between the two is not a constant, but will be found to vary with prevailing circumstances and conditions (see, e.g., *Euclid v Ambler Co.,* 272 U.S. 365, 387, *supra; Rodgers v Village of Tarrytown,* 302 N.Y. 115, *supra).*

"*What we will not countenance, then, under any guise, is community efforts at immunization or exclusion.* But, far from being exclusionary, the present amendments merely seek, by the implementation of sequential development and times growth, to provide a balanced cohesive community dedicated to the efficient utilization of land. The restrictions conform to the community's considered land use policies as expressed in its comprehensive plan and represent a bona fide effort to maximize population density consistent with orderly growth.
\* \* \*

"Perhaps even more importantly, time growth unlike the

minimum lot requirements recently struck down by the Pennsylvania Supreme Court as exclusionary, does not impose permanent restrictions upon land use (see *National Land & Inv. Co. v Easttown Twp. Bd. of Adj.,* 419 Pa. 504, *supra; Concord Twp. Appeal,* 439 Pa. 466, *supra)"* (emphasis supplied).

It is clear that in *Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, *supra)* and in *Berenson v Town of New Castle* (38 NY2d 102, 109, *supra)* the Court of Appeals elected to follow the enlightened views of the Supreme Courts of Pennsylvania and New Jersey with respect to minimum lot zoning rather than the *status quo* views of Florida which "have upheld the validity of exclusionary zoning provisions without any qualifications." Here, unlike *Levitt v Incorporated Vil. of Sands Point* (6 NY2d 269, *supra)* the record demonstrates that the five-acre zoning minimum clearly manifests the exclusionary goal of the village's residential zoning. This minimum area provision is an intrinsic and essential part of the village's misuse of the zoning power to limit the number of people living in the village to 1850. It is therefore, clear that this limitation is against the general public interest.

The record demonstrates beyond peradventure of doubt that the leaders of the village, after consulting with some of the large landowners, decided to use their zoning power to preserve the village as a citadel of privilege. Thus their zoning power was not being used as a proper exercise of the police power to serve the general welfare but rather to stop the march of progress and to preserve special benefits for the privileged group of large landowners which consists mainly of present residents of the village.

While the police power involves the protection of the general welfare of the community *(Dauernheim v Town Bd. of Town of Hempstead,* 33 NY2d 468, 473) the Court of Appeals in both *Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, 375, *supra)* and *Berenson v Town of New Castle* (38 NY2d 102, 111, *supra),* has made it clear that the "community" whose welfare must be considered in testing the validity of an application of the zoning power by a local government is not limited to the confines of the geographical subdivision adopting a zoning ordinance but extends to the rights of others in

search of a more confortable place to live as well as to the needs of the region in which the local unit is located.*

The village contends that here, unlike *National Land & Inv. Co. v Easttown Twp. Bd. of Adj.* (419 Pa 504), the zoning ordinance's primary purpose was not to prevent the entry of newcomers but merely to avoid future burdens, economic and otherwise, upon the administration of public services and facilities. In answer, it need merely be pointed out that exclusion of newcomers includes both selective admission as well as total exclusion (see *Township of Willistown v Chesterdale Farms,* 462 Pa 445, 449). As the Pennsylvania Supreme Court said in *Township of Willistown* (citing *Concord Township Appeal,* 439 Pa 466) " 'The implication of our decision in National Land [419 Pa. 504, 215 A.2d 597 (1965)] is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels * * * It is not for any given township to say who may or may not live within its confines, while disregarding the interests of the entire area.' "

In an effort to justify the exclusionary aspects of imposing five-acre minimum lot zoning on a substantial portion of the unused land, the village argues that it was seeking to preserve open space. Based on the record in this case that contention is nothing but a makeweight argument to support the exclusionary effect of its zoning ordinance which was clearly designed to stop proper growth (see *Oakwood at Madison v Township of Madison,* 72 NJ 481).

We are fully aware of the line of authority which declares that upon parties who attack a zoning ordinance rests the burden of showing that the regulation assailed is not justified under the police power of the State or by any reasonable interpretation of the facts *(Shepard v Village of Skaneateles,* 300 NY 115, 118). We are also aware that in any area of even

---

* Implied in both *Golden (supra)* and *Berenson (supra)* is the truism that zoning power, an exercise of the police power of the State, is to be used to protect and preserve the common weal, not the private interest of individual property owners or even of a local community. If an individual property owner or a group of such owners wish to preserve the sparsely inhabitated rural nature of their property they are, of course, free to do so by voluntary association for that purpose. They may not, however, under our system of constitutional government which guarantees equal protection of the laws to all persons, invoke the compulsion of State power by the use of a zoning ordinance to achieve that goal at the expense of other property owners and would-be inhabitants of the community.

moderate density, comprehensive and balanced zoning is essential to the health, safety and welfare of the community and that the task of achieving this goal devolves upon the local legislative body, and that its judgment must be allowed to control if the classification is fairly debatable *(Thomas v Town of Bedford,* 11 NY2d 428, 433; *Rodgers v Village of Tarrytown,* 302 NY 115, 121, *supra; Euclid v Ambler Co.,* 272 US 365, 388, *supra).* However, as we have noted, under the undeniable facts in this case, the plaintiffs have met that burden for it is clear that the ordinance before us was adopted to preserve the present by denying the future. No longer may governmental agencies retain the benefits of, or hereafter adopt, discriminatory, exclusionary or selective zoning ordinances which are designed solely to protect the interests of their more affluent residents by turning a blind eye and a deaf ear to the plight of the less fortunate of their own, or their regions' residents.

The judgment appealed from should therefore be reversed and a declaration should issue that that part of the zoning ordinance which creates a five-acre minimum lot requirement in certain portions of the village zoned for residential use is unconstitutional because it constitutes an unreasonable and an improper exercise of the police power. We limit our declaration to the five-acre zoning minimum because that is the only relief requested by plaintiffs.

HOPKINS, J. P., GULOTTA and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered May 13, 1977, reversed, on the law and the facts without costs or disbursements, and it is declared that that part of the zoning ordinance which created a five-acre minimum lot requirement in certain areas of the Incorporated Village of Upper Brookville which are zoned for residential use is unconstitutional as an unreasonable and improper exercise of the police power.