In the Matter of AMERICAN FRIENDS OF THE SOCIETY OF ST. PIUS, INC., Respondent, v HERMANN C. SCHWAB et al., Constituting the Board of Trustees of the Incorporated Village of Oyster Bay Cove, Appellants.

Second Department, July 2, 1979

APPEARANCES OF COUNSEL

*Sprague, Dwyer, Aspland & Tobin, P. C. (Joseph L. Tobin, Jr.,* and *Eugene Kirby Ferencik* of counsel), for appellants.

*Cohn & Foley (William S. Cohn* of counsel), for respondent.

**OPINION OF THE COURT**

SHAPIRO, J.

The Board of Trustees of the Incorporated Village of Oyster Bay Cove (the board) denied petitioner's application for permission to use certain real property which it owns as a church and residence for priests. Special Term (BURKE, J.) annulled that determination and remitted the matter to the

board with a direction that it grant the application under "such reasonable conditions as will permit establishment of petitioner's church while mitigating the detrimental or adverse effects of such use upon the community." We affirm.

The issue raised on this appeal is a recurrent one: whether a local zoning power may completely bar a religious organization from using its property for church purposes in an area zoned for residential use.

The petitioner, a not-for-profit corporation, was established by a congregation of separatist "traditional" Roman Catholics in 1973 under the aegis of the St. Pius X Society. It is the owner of a two-acre parcel of land in an area classified and zoned by a local zoning ordinance solely as a residential district and with a requirement that building lots have a minimum area of two acres. The parcel is located at the dead end of a private road more than four tenths of a mile from the nearest public road and the owners and occupants of the houses in the area are strongly opposed to its use for church purposes.

Their opposition and appellants' denial of petitioner's application are based upon the contentions that the church and its attendant traffic will devalue their properties, that the parcel is inappropriate for a church, that the proposed use of the parcel by the petitioner would create a fire hazard, and that the use will adversely affect the health, safety and welfare of residents of the village.

Thus, this is another in the line of cases beginning with *Matter of Community Synagogue v Bates* (1 NY2d 445) and *Matter of Diocese of Rochester v Planning Bd. of Town of Brighton* (1 NY2d 508) in which a local community seeks to use its zoning power to prevent the creation of a church in an area zoned for residential use.

Since the facts and the text of the relevant provisions of the appellants' zoning ordinance are set forth fully in the opinion of our dissenting brother, we do not set them forth here.

In *Matter of Diocese of Rochester (supra,* p 526), the Court of Appeals said: "That is not to say that appropriate restrictions may never be imposed with respect to a church and school and accessory uses, nor is it to say that under no circumstances may they ever be excluded from designated areas."

Later, in *Matter of Westchester Reform Temple v Brown* (22

NY2d 488, 496-497), the court again noted its awareness that there might be a conflict between the need to protect the public health, safety or welfare and the constitutional duty not to abridge the free exercise of religion and declared that a community faced with such a problem should, if possible, comply with both requirements, saying: "We have not said that considerations of the surrounding area and potential traffic hazards are unrelated to public health, safety or welfare when religious structures are involved. *We have simply said that they are outweighed by the constitutional prohibition against the abridgement of the free exercise of religion and by the public benefit and welfare which is itself an attribute of religious worship in a community.* If the community can, consistent with this policy, both comply with the constitutional requirement and, at the same time, avoid or minimize, insofar as practicable, traffic hazards or other potential detriments bearing a substantial relation to the health, safety and welfare of the community, there is no barrier to its doing so" (emphasis supplied).

It is noteworthy that, in speaking of the "constitutional prohibition against the abridgement of the free exercise of religion", the court recognized and paid deference to "the public benefit and welfare which is itself an attribute of religious worship in a community." Human experience teaches us that public officials, when faced with pressure to bar church uses by those residing in a residential neighborhood, tend to avoid any appearance of an antireligious stance and temper their decision by carefully couching their grounds for refusal to permit such use in terms of traffic dangers, fire hazards and noise and disturbance, rather than on such crasser grounds as lessening of property values or loss of open space or entry of strangers into the neighborhood or undue crowding of the area. Under such circumstances it is necessary to most carefully scrutinize the reasons advanced for a denial to insure that they are real and not merely pretexts used to preclude the exercise of constitutionally protected privileges.

In *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor* (38 NY2d 283), the court's opinion, written by Judge FUCHSBERG and in which Judges GABRIELLI and COOKE (now Chief Judge) concurred, struck down the special use ordinance there under consideration. The ordinance directed the authorities to deny a permit if they

found that the religious use would "have any detrimental effect on public safety, health, or welfare, including effects on traffic, on fire safety, and on the character of the surrounding neighborhood" *(supra,* p 289).*

They did so because it contained no substantial requirement that efforts to accommodate or mitigate the effects be made and they then interpreted the decision in *Matter of Diocese of Rochester* (1 NY2d 508, *supra)* to mean that "where an irreconcilable conflict exists between the right to erect a religious structure and the potential hazards of traffic or diminution in value, the latter must yield to the former" *(supra,* p 288).

In our case appellants claim that their denial of petitioner's application resulted from their findings that the proposed use would generate considerable extra traffic, pose a danger to area residents and others, result in lot area coverage of 40% to 55% when only 15% is permitted by the ordinance, create drainage and sewage problems, be inappropriate for a place of public assembly because there is no secondary means of access, and substantially devalue adjacent property and de- stroy the character of the area. Appellants noted that the planning history of the subdivision in which the property is located involved a low-density residential use only. They ap- parently entirely disregarded the applicant's offer to comply with all appropriate safety requirements, noting, instead (and this may well have let the "cat out of the bag"), that the erection of a church in the contemplated area would disturb or annoy adjacent residents and there were already two religious facilities in the village.

Our dissenting brother contends that in affirming here this court "necessarily accepts the proposition implicit in the opinion of Special Term, that if the adverse or detrimental effects of petitioner's church cannot be mitigated and an irreconcilable conflict develops between the right to erect a religious structure and the hazards generated by the religious structure, the latter.must yield to the former." In so doing he fails to give proper weight to the fact that the judgment under

---

* Chief Judge BREITEL concurred in the result, but agreed "with so much of the dissent as characterizes the majority expression of the law as too absolutist in providing a preference and even to some extent an immunity from significant zoning regulation for premises devoted to religious uses", although he conceded that "there is the broad language in the precedents which might support" the majority view *(supra,* pp 291-292).

appeal does not so hold, nor is there any necessity for such a determination at this point. The judgment simply annuls the denial of the petitioner's application and remits the matter to appellants for the purpose of fashioning "such reasonable conditions as will permit establishment of petitioner's church while mitigating the detrimental or adverse effects of such use upon the community." Until the appellants attempt to establish such reasonable conditions, it is premature to deal with the issue raised by the dissent, which is whether the petitioner's right to use its property for church purposes must be implemented even if it develops that it is impossible to fashion reasonable conditions. There is nothing in the record, at this point, which supports any conclusion that such a situation will eventuate here.

■ ■ We had occasion in a recent decision, *Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville* (67 AD2d 70, 82, n), to declare: "Implied in both *Golden ([Matter of Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359] *supra)* and *Berenson ([Berenson v Town of New Castle,* 38 NY2d 102] *supra)* is the truism that zoning power, an exercise of the police power of the State, is to be used to protect and preserve the common weal, not the private interest of individual property owners or even of a.local community." Nor may the zoning power be used to deny the constitutional right to the free exercise of religion by a chilling application of zoning laws.

In our view the position taken in the dissent is, at best, premature and at worst an encouragement to those who would limit the constitutional guarantee of the free exercise of religion by using the local zoning power as a free-wheeling excuse to exclude places of religious worship from their neighborhoods.

SUOZZI, J. P. (dissenting). I dissent and vote to modify the judgment by adding thereto a provision that if, upon remand, it is determined that the adverse effects of petitioner's church cannot be mitigated and that an irreconcilable conflict develops between the right to erect a religious structure and the hazards generated by this use, the former must yield to the village's zoning requirements.

The judgment appealed from (1) annulled the appellants' resolution and decision denying petitioner's application to operate a church on the subject property and (2) remitted the matter to appellants to fashion such reasonable conditions as

will permit establishment of petitioner's church while mitigating the detrimental or adverse effects of such use upon the community.

By affirming the judgment, the majority necessarily accepts the proposition implicit in the opinion of Special Term, that if the adverse or detrimental effects of petitioner's church cannot be mitigated and an irreconcilable conflict develops between the right to erect a religious structure and the hazards generated by that religious structure, the latter must yield to the former.

It is with this underlying proposition and Special Term's reliance on the recent case of *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor* (38 NY2d 283), to support the proposition, that I respectfully disagree. In my view, a close scrutiny of the concurring and dissenting opinions in that case indicates that a majority of the Court of Appeals has moved toward the view that there are legitimate and serious considerations of public health, safety and welfare, i.e., fire and similar emergency risks, and traffic conditions insofar as they involve public safety, which outweigh any policy favoring religious structures.

In *Synagogue (supra),* the plaintiff purchased two lots which had originally been part of a large estate that was subdivided into seven lots. The synagogue sought to use the former estate house as a residence for its rabbi. The estate house is located 29 feet from the property line. The zoning ordinance of the village required that all religious uses located in residential areas be set back at least 100 feet and the board was not given the authority to vary the 100-foot setback requirement. The village was also granted the power to consider on various grounds the suitability of a religious use in the planned location. When the synagogue applied for a special use permit and the requisite variance, the variance was denied and, as a consequence, the permit was also denied. The board indicated that had not the denial of the variance settled the matter, it would have denied the special permit because of the synagogue's potential effect on traffic and insufficient water pressure in nearby fire hydrants.

Special Term declared the ordinances in question unconstitutional as applied to plaintiff and the Court of Appeals affirmed. A three-member plurality of the Court of Appeals held that both the special use ordinance and the variance ordinance were constitutionally defective in that they con-

tained no substantial requirement that efforts be made to accommodate or mitigate the adverse or detrimental effects of the synagogue.*

The three-member plurality also held that "invariability" was not "the only evil in the ordinance" (supra, p 289), but that applicability of the ordinance to the synagogue was not supported by sufficient evidence since the board's objections were based on "perceived inconveniences" (supra, p 290) and were made without hard evidence of any fire protection or traffic problem.

In a concurring opinion (then Chief) Judge BREITEL (with Judge WACHTLER concurring) was of the view that "[f]undamentally, the law should move in the direction of requiring even religious institutions to accommodate to factors directly relevant to public health, safety, or welfare, inclusive of fire and similar emergency risks, and traffic conditions insofar as they involve public safety * * * It is the all but conclusive presumption that considerations of public health, safety and welfare are always outweighed * * * by the policy favoring religious structures that I find objectionable" (supra, pp 291-292). Judge BREITEL concurred to affirm solely on the ground that "the effect, if not the purpose, of the ordinance is exclusionary, without compensating values to sustain a public purpose related to public safety and public welfare" (supra, p 292).

In his dissent, Judge JONES (joined by Judge JASEN), in voting to reverse, was of the view that churches and schools should be subject to appropriate restrictions and that "[g]iven the reasonable expectation that use of the premises * * * for synagogue purposes will surely increase vehicular traffic in the area and create parking problems, not only endangering the comfort and convenience of residents of the community but also creating hazards to public health and safety" there was no "constitutional or other legal considerations" which precluded the application of the reasonable provisions of the zoning ordinance to the subject property (supra, p 295).

The facts of the case at bar are somewhat analogous to those in Synagogue. Petitioner, a religious corporation, purchased the subject 2.12-acre parcel, which is located in the

---

* The special use ordinance allowed the authorities to deny the permit if they found that the religious use would have any detrimental effect on public safety, health or welfare including effects on traffic and fire safety; the ordinance requiring religious uses to be set back 100 feet could not be varied.

Woodward Estates subdivision in the Incorporated Village of Oyster Bay Cove. The parcel is located in a residence "A-1" district which requires a minimum lot area of two acres. Although a religious use is specifically enumerated as permissible in the "A-1" district where the property is located, site plan approval must first be obtained from the Board of Trustees of the village. Specifically, article V (§ 5.0, subd [f]) of the zoning ordinance authorizes religious uses as follows: "Churches for public worship and other strictly religious uses, Convents, Novitiates and Monasteries maintained in accordance with the discipline, rules and usage of the religious corporation or other entity which will own, support and maintain such Church, Convent, Novitiate or Monastery and of the ecclesiastical governing body, if any, to which such corporation or other legal entity is subject, provided, however, that the percentage of lot covered by buildings, the size, location and capacity of the buildings, the dimensions of the yards, setbacks, the provisions for automobile parking space and arrangement of access thereto and the arrangement of roadways on and giving access to the site shall be in accordance with a site plan or subsequent amendment thereto approved by the Board of Trustees of the Village."

In addition, section 5.4 of article V of the ordinance, applicable to all "A-1" uses, provides: "Without regard to the generality of this section as limited by the particularization of the foregoing specified uses, no building or premises shall be used for any purpose which is or may reasonably be expected to be obnoxious or offensive by reason of causing or emitting odor, smoke, gas, dust, garbage, refuse matter, noise or vibrations, or that is dangerous or harmful to the health, peace, comfort or safety of the community or that tends to disturb or annoy residents of the Village or that involves any explosion menace or any serious fire hazard."

At present, several buildings exist on the subject property, including a four-bedroom house with an attached ballroom and a separate three-bedroom cottage attached to an indoor tennis court. Under the proposed site plan submitted by the church, the house would continue as a residence or rectory and the 35 by 90-foot ballroom would be converted into a chapel seating 250 persons. The cottage would be used for visitors and on-site parking was provided for from 89 to 104 automobiles. As noted by Special Term, "[b]ased upon the experience of its congregational growth and a few short-term

attendance and parking statistics", petitioner estimated that its two proposed Sunday morning masses would be attended by 340 to 380 persons in total, with as many as 200 at a single mass.

In contrast to these operational features of the proposed church are the following geographic realities: "The proposed church is located at a cul-de-sac at the extreme southerly end of Pond Place and is approximately 2,200 feet away from the nearest public highway, Berry Hill Road. The parcel is accessible by traversing two privately maintained roads, Woodward Drive and Pond Place, a distance of four tenths of a mile. These two access roads are hilly and, in accordance with the low-density residential use of the area, each has a paved width of only 22 feet.

During the hearing before the board, there was competent and substantial evidence adduced that the parking facilities as proposed in the site plan, and the combination of the two narrow private access roads to the site, the church's location at the end of a dead end street and the vehicular traffic generated prior to and following church sevices, would create the following real hazards: "(1) a fire hazard to the church caused by the proposed on-site parking of 89 to 104 cars next to the building which would impede access to the structure by fire apparatus; and (2) a fire hazard to the church and the surrounding area residents by virtue of the fact that access of emergency vehicles would be seriously impeded by the traffic on the two narrow access roads prior to and after church services and by any vehicles parked on the road during the church services. Clearly, sections 5.0 (subd [f]) and 5.4 of the zoning ordinance suffer from the same infirmity which tainted the ordinance in *Synagogue,* i.e., they authorize the denial of a permit to a religious institution without setting reasonable requirements for adaptations which would mitigate any adverse effects of the religious use. While Special Term did not reject the board's conclusion that the proposed church use presented a substantial fire hazard, it followed the narrow holding of *Synagogue,* annulled the board's denial of petitioner's application, and remanded the matter to the board to impose reasonable conditions which would mitigate any adverse effects of the proposed use. However, Special Term also quoted language from *Matter of Westchester Reform Temple v Brown* (22 NY2d 488, 497), that "where an irreconcilable conflict exists between the right to erect a religious structure

and * * * potential hazards * * * the latter must yield to the former."

Practically speaking, this quotation stands for the proposition that even if the adverse effects generated by the religious institution cannot be mitigated, the religious institution's use must still be allowed by the municipality. In the face of the tenor and language of Special Term's opinion, the consideration herein of the ultimate issue presented by this controversy is not premature as the majority suggests. While the proposition advanced by the language of Special Term's opinion may have been the law at the time of the *Westchester* decision in 1968, from reading the dissent and the precise language of the concurring opinion in *Synagogue* (i.e., "the law should * * * [require] even religious institutions to accommodate to factors directly relevant to public health, safety, or welfare, inclusive of fire and similar emergency risks, and traffic conditions insofar as they involve public safety" [38 NY2d 283, 291-292]) it appears to me that it is no longer the prevailing rule today in the Court of Appeals.

Accordingly, I dissent and vote to modify the judgment appealed from.

LAZER, GULOTTA and COHALAN, JJ., concur with SHAPIRO, J.; SUOZZI, J. P., dissents and votes to modify the judgment by adding thereto a provision that if, upon remand, it is determined that the adverse effects of petitioner's church cannot be mitigated and that an irreconcilable conflict develops between the right to erect a religious structure and the hazards generated by this use, the former must yield to the village's zoning requirements, with an opinion.

Judgment of the Supreme Court, Nassau County, entered April 28, 1978, affirmed, without costs or disbursements.