In the Matter of HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, Appellant, v GABRIEL ROSENFELD et al., Constituting the Zoning Board of Appeals of the Town of New Castle, Respondents, and SOCIETY OF NEIGHBORS, Intervenor-Respondent.

Second Department, January 17, 1983

APPEARANCES OF COUNSEL

*Levy, Gutman, Goldberg & Kaplan (Jeremiah S. Gutman* of counsel), *Murray, Bank & Sheer (Norman Sheer* of counsel), and *Fischbein, Olivieri, Rozenholc & Badillo (Herman Badillo* of counsel), for appellant. (One brief.)

*Anderson Russell Kill & Olick, P. C. (Arthur S. Olick, Andrew P. Brozman* and *Lisa D. Levey* of counsel), and *Lawrence Dittelman, Town Attorney,* for respondents. (One brief.)

*Parker, Chapin, Flattau & Klimpl (Herbert L. Rosedale, Elliot Cohen, Charles W. Stotter, Michael Friedman* and *Daniel M. Kolko* of counsel), for intervenor-respondent.

OPINION OF THE COURT

TITONE, J. P.

Appellant, the Holy Spirit Association for the Unification of World Christianity (hereinafter the Unification Church) is a religious entity, whose members are followers of the Reverend Sun Myung Moon (see *Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Comm. of City of N. Y.,* 55 NY2d 512, 526). In this proceeding, the Unification Church, *inter alia,* challenges a determination of the Zoning Board of Appeals of the Town of New Castle (hereinafter the zoning board) denying its application for a special use permit for the operation of a training and recruitment center in the town. The application was denied on the grounds (1) that the Unification Church did not intend to comply with certain intensity of use provisions set forth in paragraph 60-437.62 of the Code of the Town of New Castle (2) that the intended use "will place unwarranted, unusual and unreasonable burdens on public facilities and will be detrimental to the public health, safety and welfare" and (3) that the Unification Church deceived the zoning board and violated the provisions of the zoning ordinance while its application was pending. Special Term concluded that these findings were supported by substantial evidence, and dismissed the petition with prejudice insofar as it sought review of the determination of the zoning board.

The proposed use, which is religious in nature, may be prohibited if it is "convincingly shown that [it] will have

a direct and immediate adverse effect upon the health, safety or welfare of the community" (see *Matter of Westchester Reform Temple v Brown,* 22 NY2d 488, 494). In our view, the evidence in the record failed to so demonstrate. Nevertheless, we affirm the judgment of Special Term. Generally, municipalities should make efforts to accommodate proposed religious uses, subject to conditions reasonably related to land use (see *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor,* 38 NY2d 283, 290, cert den 426 US 950). In the instant case, however, the Unification Church's misrepresentations to the zoning board, and its conceded violations of provisions of the zoning ordinance while its application was pending, fully justified the zoning board's denial of a special use permit.

### I. THE FACTS

This controversy concerns 97.886 acres of land with frontage on Armonk Road, a major artery, and Tripp Street, a local artery. The subject property is located in a district currently zoned R-2A (two-acre residential). In the 1950's, the previous owners, the Sisters of Cenacle, converted a mansion on the property into a retreat facility with 113 bedrooms. In June, 1976, the Sisters of Cenacle sold the property to two doctors who planned to use it as a facility for the mentally retarded. After the doctors met with financial difficulties and defaulted on their purchase-money mortgage, the Unification Church purchased the property in April, 1979 at a foreclosure sale.

In July, 1979 the Unification Church applied for a special use permit pursuant to permitted principal use 15 of paragraph 60-411 and paragraph 60-432 of the Code of the Town of New Castle, to use the property as a religious retreat center. In its application, it acknowledged that it intended to conduct retreats varying in duration from weekends to 21 and 40 days in length. The application also stated: "It is anticipated that the number of permanent staff residents would number about ten people with a maximum of twelve. The total number of people participating in one of the retreat workshops would not exceed 70, thus the maximum number of people residing at the prop-

erty at any given time would not exceed 82. We would expect a norm of between 40 and 50 people."

On July 25, 1979, at a regular meeting of the zoning board, counsel for the Unification Church stipulated that "[a]bsolutely" no workshops or seminars would be held on the property and no "third persons" would be invited to the property while the application for a special use permit was pending. Thereafter, in a letter dated September 6, 1979, counsel for the Unification Church made the following representations to the Town of New Castle: "In regard to occupancy of the Cenacle property by the Unification Church pending the Zoning Board of Appeals decision, please be advised that such occupancy will be in accordance with code requirements. There will be no more than three residents who, being unrelated by blood or marriage, will constitute a family under your zoning ordinance. At night, there will be several other people at the property to assure security, but they will not sleep there. During the day, there will be other people at the premises doing work, however, these people will leave each night and sleep elsewhere."

The zoning board held a hearing on the Unification Church's application, and heard testimony that the church engaged in certain undesirable religious practices. There was evidence that the church concealed its true identity when it recruited participants for its religious retreats and when it solicited monetary contributions. A former member of the church testified that participants in religious retreats were allowed only between four and five hours of sleep per night, received an unbalanced diet with an over-concentration of starch, and only spotty medical treatment. Expert testimony indicated that the church used "orchestrated pressure" during religious retreats, including peer pressure, preaching, and sleep deprivation. This regimen was known in the psychiatric community as "indoctrinational thought reform". Such pressures could induce certain individuals to enter psychotic states, or commit violent acts against themselves or others. There were, in fact, isolated instances of suicide within the church.

Testimony was also elicited that the Unification Church provoked certain hostile reactions from the community at

large, including the kidnapping of church members for deprogramming. On occasion, certain members of the church had reacted to such hostility with violence. There is no evidence in the record, however, that the Unification Church advocates violence as a proper response to community hostility.

During the course of the hearing, the zoning board learned that the Unification Church was conducting retreats on the subject property in contravention of the zoning ordinance and the stipulation of its attorney that it would not do so. A participant in these retreats testified that he arrived at the site on July 24, 1979, one day before the Unification Church explicitly agreed not to conduct any retreats on the subject property while the application was pending, and stayed for three weeks. The church refused to provide any information with respect to those violations of the zoning ordinance unless and until it received immunity from criminal prosecution. After receiving immunity, the church acknowledged that "[b]etween the dates of April 24, 1979 and September 4, 1979, approximately ten to twelve seven-day workshops were conducted on the Cenacle property."

When members of the zoning board visited the subject property in December, 1979, they also learned that the church was violating its agreement to house no more than three residents unrelated by blood or marriage on the property while the application was pending. They counted "no fewer than twelve separate beds" which appeared to have been made up for sleeping. The church acknowledged that there were six persons unrelated by blood or marriage residing on the subject property, but, by way of explanation, noted that three of those persons slept during the day.

## II. RELEVANT CODE PROVISIONS

Paragraph 60-432.1 of the Code of the Town of New Castle provides that the zoning board "may" authorize the issuance of a special use permit for property in a residence district, if "the proposed use will serve a community need or convenience." In this case the proposed use, which is institutional in nature, must also satisfy certain "[i]ntensity of [u]se" requirements set forth in paragraph 60-

437.62, which provides, in pertinent part: "In no case, however, shall the maximum number of persons permitted to occupy institutional sites amount to more than the number resulting from dividing the total site area by the minimum lot size requirement for the district in which it is located and multiplying by two (2) to determine the maximum number of persons who shall be permitted to occupy the site on a regular daily basis, and by three (3) to determine the maximum number of persons who shall be permitted to occupy the site at any one (1) time for any purpose. Residents on a permanent basis shall be limited only to those employees and their families necessary for the proper operation and maintenance of the facility. The overnight lodging of temporary guests may be allowed only while they are participating in permitted functions of the institution as set forth in the special permit, and for periods not to exceed three (3) days."

The instant suit, which was brought as a CPLR article 78 proceeding against the zoning board, and not against the Town of New Castle itself, is not the proper vehicle to test the validity of those provisions of the zoning ordinance (see *Matter of Kovarsky v Housing & Dev. Admin. of City of N.Y.,* 31 NY2d 184, 191-192). Further, the zoning board had no authority, absent an application for a variance, to waive or modify the explicit conditions laid down in the town code (see *Matter of Jewish Reconstructionist Synagogue of North Shore v Levitan,* 34 NY2d 827; *Matter of Independent Church of Realization of Word of God v Board of Zoning Appeals of Inc. Vil. of Muttontown,* 81 AD2d 585, 587).

Pursuant to the intensity of use provisions, the subject property will accommodate 98 occupants on a regular daily basis and 147 occupants at any one time for any purpose. In its application, the Unification Church agreed to limit the maximum number of participants in retreat workshops to 70. However, retreat workshops would not be limited in time to three days' duration, thus running afoul of the provision that "overnight lodging of temporary guests may be allowed * * * for periods not to exceed three (3) days." The Unification Church argues that participants in retreat workshops would be housed on the property on a "regular

daily basis" and therefore cannot be considered "temporary guests". This construction is, at best, strained and convoluted, and contrary to the interpretation by the zoning board which found "[t]he language of ¶ 60-437.62 is clear and its legislative intent unambiguous * * * [I]t is apparent that compliance with the intensity of use provisions of the Code is neither sought nor intended by the Applicant." The law is well settled that the construction of a statute by the administrative body charged with the duty of interpreting its provisions should be accorded great weight (see *Matter of 440 East 102nd St. Corp. v Murdock*, 285 NY 298, 309; *East Bayside Homeowners Assn. v Board of Stds. & Appeals of City of N.Y.*, 77 AD2d 858).

In its brief to this court, the zoning board asserts that it "expressly declined to base its denial of Unification's application upon the *intensity* of Unification's proposed use of the Cenacle property." Indeed, in its decision and report, the zoning board stated that the intensity of the proposed use was "neither the sole nor the principal basis" for denial of the application. The decision and report did note, however, that the zoning board considered the Unification Church's "disregard of this Code requirement to be one appropriate ground for denial of its application." The church's failure to comply with the intensity of use provisions was thus cited as a ground for denying the application. If that had been the only ground upon which it was denied, some accommodation might have been possible, such as the imposition of a condition limiting the duration of retreat workshops to no more than three days. The zoning board also found, however, that the proposed use would be "detrimental to the public health, safety and welfare."

### III. THE PROPOSED USE VIS-A-VIS PUBLIC HEALTH SAFETY AND WELFARE

Although the instant proceeding is not the proper vehicle to challenge the constitutionality of the relevant town code provisions, the validity of the zoning board's decision is properly before us (see *Matter of Diocese of Rochester v Planning Bd. of Town of Brighton*, 1 NY2d 508, 521). While its application was pending before the zoning board, the Unification Church commenced an action in the United

States District Court for the Southern District of New York, demanding, *inter alia,* injunctive relief directing the zoning board to issue a special use permit. Before the zoning board reached its decision on the application, the Federal action was dismissed by the District Court (see *Holy Spirit Assn. for Unification of World Christianity v Town of New Castle,* 480 F Supp 1212). Therefore, the validity of the zoning board's decision was not considered. The court did note, however, that religious conduct is subject to regulation (480 F Supp, at p 1216).

The free exercise of religion is constitutionally protected (see US Const, 1st Amdt; NY Const, art I, § 3). But, while the freedom to harbor religious beliefs is absolute, the freedom to engage in religious practices is not (see, e.g., *Sherbert v Verner,* 374 US 398, 402-403; *Cantwell v Connecticut,* 310 US 296, 298-299; *La Rocca v Lane,* 37 NY2d 575, cert den 424 US 968; *Matter of Brown v McGinnis,* 10 NY2d 531, 536; *People v Woodruff,* 26 AD2d 236, 238, affd 21 NY2d 848). The law is well settled that religious practices are subject to regulation for the protection of society (see *La Rocca v Lane, supra; Matter of Brown v McGinnis, supra*).

■ With respect to zoning restrictions, New York adheres to the majority view that religious institutions are beneficial to the public welfare by their very nature (see 2 Rathkopf, The Law of Zoning & Planning [4th ed], § 20.01[2], p 20-3; *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor,* 38 NY2d 283, 286, cert den 426 US 950, *supra; Matter of Westchester Reform Temple v Brown,* 22 NY2d 488, 493, *supra; Matter of Diocese of Rochester v Planning Bd. of Town of Brighton,* 1 NY2d 508, *supra; Matter of Seaford Jewish Center v Board of Zoning Appeals of Town of Hempstead,* 48 AD2d 686). Consequently, a proposed religious use should be accommodated, even when it would be inconvenient for the community (see *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor, supra;* Walker, What Constitutes a Religious Use for Zoning Purposes, 27 Catholic Lawyer 129, 167, n 182). A religious use may not be prohibited merely because of potential traffic congestion, an adverse effect upon property values,

the loss of potential tax revenue, or failure to demonstrate that a more suitable location could not be found (see *Matter of Westchester Reform Temple v Brown, supra,* p 493; *Matter of American Friends of Soc. of St. Pius v Schwab,* 68 AD2d 646, 649, app dsmd 48 NY2d 754; *Matter of Community Synagogue v Bates,* 1 NY2d 445). In order to deny a special use permit for a religious use as "detrimental to the public health, safety and welfare", "it must be convincingly shown that the [proposed use] will have a direct and immediate adverse effect upon the health, safety or welfare of the community" (*Matter of Westchester Reform Temple v Brown, supra,* p 494). A distinction must be drawn between danger to the public and mere public inconvenience (see *Sherbert v Verner,* 374 US 398, 403, *supra; Slevin v Long Is. Jewish Med. Center,* 66 Misc 2d 312, 319-320; cf. *Matter of Mikveh of South Shore Congregation v Granito,* 78 AD2d 855; *Congregation Gates of Prayer v Board of Appeals of Vil. of Lawrence,* 48 AD2d 679). Every effort must be made to accommodate the religious use subject to conditions reasonably related to land use (see *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor, supra; Matter of Summit School v Neugent,* 82 AD2d 463, 467). Consistent with this analysis, governmental regulation of religious practices and conduct which pose a substantial threat to public peace, safety or order generally does not run afoul of constitutional guarantees of the free exercise of religion (see, e.g., *Jacobson v Massachusetts,* 197 US 11 [compulsory vaccination]; *Reynolds v United States,* 98 US 145 [polygamy]; *State ex rel. Swann v Pack,* 527 SW2d 99 [Tenn], cert den 424 US 954 [snake handling]; cf. *Wisconsin v Yoder,* 406 US 205 [right to refuse compulsory secondary education]; *People v Woody,* 61 Cal 2d 716 [right to use peyote in religious services]).

The evidence presented at the hearing before the zoning board falls into two categories: (1) evidence that the Unification Church's training regimen is deleterious to the mental and physical health of participants in retreat workshops, and (2) evidence that the Unification Church's activities are deleterious to the community at large. There is substantial evidence in the record that the training regimen imposed by the Unification Church is not beneficial to

the health of participants. The proof established that in isolated instances, participants crack under strain, enter psychotic episodes, and/or become suicidal. The evidence did not establish, however, that the average participant is in imminent danger of losing his, or her, life or health. The participants in the retreat workshops of the Unification Church are adults, with the constitutional right to choose their own life-styles (see Governor's Veto Memorandum, NY Legis Ann, 1981, p 568; *Katz v Superior Ct. of City & County of San Francisco,* 73 Cal App 3d 952; cf. *Prince v Massachusetts,* 321 US 158, 167-170). Further, absent special circumstances, they have the right to decline regular medical treatment (see *Winters v Miller,* 446 F2d 65, cert den 404 US 985; *Matter of Melideo,* 88 Misc 2d 974).

On this record, it cannot be said that it has been established that the activities of the Unification Church pose a threat to public health or morals (cf. *Jacobson v Massachusetts, supra; Reynolds v United States, supra*). Its activities may provoke hostile and perhaps violent reactions from the families of participants and other members of the public at large. The law is well settled, however, that public intolerance, animosity or unrest does not justify a prohibition of free assembly and association (see *Coates v City of Cincinnati,* 402 US 611, 615; *Street v New York,* 394 US 576, 592; *Cox v Louisiana,* 379 US 536, 551-553; *Edwards v South Carolina,* 372 US 229, 238; *Terminiello v Chicago,* 337 US 1; *Cantwell v Connecticut,* 310 US 296, 311, *supra; Collin v Smith,* 578 F2d 1197, 1203; *Village of Skokie v National Socialist Party of Amer.,* 69 Ill 2d 605; *Matter of Rockwell v Morris,* 12 AD2d 272, affd 10 NY2d 721, cert den 368 US 913). Religious or even political expression, which is otherwise lawful, may not be prohibited merely because such expression "incites others to * * * unlawful action" (see *Matter of Rockwell v Morris,* 12 AD2d 272, 281, *supra*).

Therefore, we conclude that the evidence failed to demonstrate that the proposed use will have "a direct and immediate adverse effect upon the health, safety or welfare of the community" (see *Matter of Westchester Reform Temple v Brown,* 22 NY2d 488, 494, *supra*).

IV. MISREPRESENTATIONS AND/OR FRAUD AND DECEIT

In the landmark decision *Cantwell v Connecticut* (310 US 296, 306, *supra*), the United States Supreme Court noted: "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent."

There was testimony before the zoning board that the Unification Church has concealed its true identity, and even the fact that it is a religious entity, when recruiting participants for its religious retreats, and in soliciting monetary contributions. Such conduct is not constitutionally protected. However, the evidence in the record indicates that these practices occur primarily off the sites of the Unification Church's religious retreats. Further, there is some question as to whether the regulation of these practices is reasonably related to land use, and therefore within the province of the zoning board (see *Matter of Summit School v Neugent*, 82 AD2d 463, *supra*). Preferably, such conduct should be proscribed by imposition of penal sanctions (cf. Penal Law, § 165.30, subd 1). The Legislature may be well advised to look into the matter.

While its application for a special use permit was pending, however, the Unification Church made other misrepresentations which were directly related to land use. On July 25, 1979, the church stipulated that it would conduct no workshops, retreats or seminars on the property while the application was pending, yet it is now conceded that between April 24, 1979, and September 4, 1979, approximately 10 to 12 seven-day workshops were conducted on the subject property. The church further agreed that no more than three people unrelated by blood or marriage would reside on the property while the application was pending, but when members of the zoning board

visited the site, they counted no fewer than 12 beds which appeared to be made up for sleeping. The church acknowledged that at that juncture there were six people residing on the property. It now contends that the zoning board should have made an effort to accommodate the proposed use by granting a special use permit, subject to conditions designed to mitigate the deleterious impact of the proposed use (see *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor,* 38 NY2d 283, cert den 426 US 950, *supra*). However, if the church would not, or could not, comply with representations made while the application for a special use permit was pending, the zoning board could properly infer that it would not comply with conditions imposed on its proposed use. Further, the church's deceit, in and of itself, justified denial of the special use permit (see *Matter of Bell v Waterfront Comm. of N. Y. Harbor,* 20 NY2d 54; *Matter of Ostroff v Sacks,* 64 AD2d 708).

### V. DUE PROCESS CONSIDERATIONS

The Unification Church asserts that the determination of the zoning board should, nevertheless, be annulled, because the board was biased, called its own witnesses, and packed the record with irrelevant material. The church has not established bias. The zoning board had the legal right to make its own investigation of the proposed use (see *Matter of Donegan v Griffin,* 270 App Div 937; 2 Anderson, New York Zoning Law & Practice [2d ed], § 20.17; see, also, *Matter of Miller v Ward,* 72 AD2d 565, affd 51 NY2d 887). Moreover the zoning board was not required to follow formal rules of evidence (see *Matter of Von Kohorn v Morrell,* 9 NY2d 27, 32; *People ex rel. Fordham Manor Ref. Church v Walsh,* 244 NY 280, 287). Although the evidence was insufficient to support each of the zoning board's findings, there was competent and substantial evidence to sustain its ultimate determination (see *Matter of Laucella v Siegel,* 38 AD2d 973). Therefore, the instant proceeding was properly dismissed.

THOMPSON, WEINSTEIN and BROWN, JJ., concur.

Judgment of the Supreme Court, Westchester County, dated February 18, 1981, affirmed, with costs.