**CONGREGATION BETH YITZCHOK OF ROCKLAND, INC., Plaintiff,**

v.

**TOWN OF RAMAPO, John Sengstacken, Individually and as Building Inspector for the Town of Ramapo, Gordon Wren, Individually and as Assistant Building Inspector for the Town of Ramapo and the New York State Department of Social Services, Defendants.**

**No. 83 Civ. 7928–CSH.**

United States District Court, S.D. New York.

July 24, 1984.

Reback & Reback, Nanuet, N.Y., for plaintiff; David C. Reback, Eileen J. Potash, Nanuet, N.Y., of counsel.

Herschel Greenbaum, Suffern, N.Y., for defendants John Sengstacken & Gordon Wren; John Chronin, Paula Cohen, Suffern, N.Y., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

In this action, which came on by order to show cause, plaintiff Congregation Beth Yitzchok of Rockland, Inc. ("Beth Yitzchok") seeks to preliminarily enjoin defendant Town of Ramapo ("the Town") from enforcing certain municipal regulations that interfere with plaintiff's operation of a religious nursery school on the synagogue premises. Rabbi Meshulem Rottenberg is the spiritual leader of the congregation. Plaintiff alleges that the actions of defendants are in violation of the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

After a hearing before this Court, I denied plaintiff's application for a temporary restraining order and directed that the matter be more fully briefed before determination of the instant motion for a preliminary injunction. Subsequent thereto, several events have transpired. First, plaintiff withdrew its action against defendant New York State Department of Social Services. Second, in the hope of facilitating a resolution of this matter without recourse to further litigation, the Court convened a conference with the remaining parties to discuss what specific measures plaintiff would be required to take in order to enable its premises to be used as a synagogue and/or religious nursery school. That conference resulted in a further inspection of the synagogue premises by the Town of Ramapo and additional written submissions by both parties. Although this exercise helped to some extent to clarify the statutory framework of this action, it did not lead to the conciliation urged by the Court. Accordingly, I turn to a consideration of plaintiff's motion for injunctive relief.

## I.

### Background

In April of 1983, plaintiff Beth Yitzchok purchased the premises at 61 College Road, Monsey, Rockland County, New York, for use as a synagogue and as the Rabbi's parsonage. Although, because of certain delays in clearing title, the property was not deeded to Beth Yitzchok until April, plaintiff actually took possession of the premises under a lease arrangement in July of 1982. In September of 1982, plaintiff commenced operation of a religious school for the teaching of Jewish laws and customs to children between the ages of three and five. (Rottenberg Aff. of Oct. 26, 1983, ¶ ¶ 4–7).

The nursery school operated apparently without incident until April 20, 1983, when the Town of Ramapo issued an order, signed by defendant Sengstacken, the town building inspector, citing plaintiff for violation of Section 140–10A of the Revised Code of the Town of Ramapo. That section provides as follows:

"Section 140–10 Certificate of Occupancy and or use.

"C. No change shall be made in the use or occupancy of a building or structure unless a Certificate of Occupancy authorizing the change of use shall have been issued. A change in use shall include, but not be limited to a change in or of the type, class, nature or scope of the goods, services or operation."

Specifically, the order directed plaintiff to cease operation of the nursery school, that use being "neither in conformity with the Certificate of Occupancy nor a use accessory to said certificate." (Comp., Ex. A). The order further indicated that use of the building as a synagogue also violates the present Certificate of Occupancy. *Id.* Rabbi Rottenberg was served simultaneously with an appearance ticket directing him to appear before the Justice Court of the Town of Ramapo to answer the charge that his use of the premises violated the

ordinance. (Comp., Ex. B). After trial, Rabbi Rottenberg was fined $125 and given a conditional discharge, the condition being that he not repeat the violation within the next six months. During this time period, Rabbi Rottenberg and Beth Yitzchok were also served with a second appearance ticket alleging the same violation, a charge that was later dismissed on the motion of the Town of Ramapo. (Rottenberg Aff. ¶¶ 11–17). As a result of these events, plaintiff alleges that it has been forced to close its nursery school (*id.*, ¶ 20) and, despite numerous attempts, has not been able to secure an acceptable new location for the school. (*Id.*, ¶ 22).

## II.

*Plaintiff's Motion for a Preliminary Injunction*

In order to prevail on its motion for preliminary injunctive relief, plaintiff must demonstrate both irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation coupled with a balance of hardships tipping decidedly in its favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Mattel, Inc. v. Azrak-Hamway Intern, Inc.*, 724 F.2d 357, 359 (2d Cir.1983). In order to utilize the less onerous "serious questions" prong of the above standard, a plaintiff must make the additional showing that the hardships it will suffer if the injunction does not issue far outweigh the hardships which would be visited upon defendants if the injunction is granted. Stated simply, "the equities must strongly favor the issuance of an injunction." *Cavallaro by Cavallaro v. Ambach*, 575 F.Supp. 171, 174 (W.D.N.Y.1983).

In the instant action, plaintiff seeks to enjoin defendant from enforcing various regulations allegedly applicable to plaintiff's use of its premises for a religious nursery school on the ground that such enforcement violates both the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Four-teenth Amendment. The irreparable harm alleged is both constitutional and financial, the latter being the loss of approximately $15,000 in annual revenue from plaintiff's operation of a nursery school. Although this financial injury would appear to be wholly compensable in monetary damages, the constitutional deprivation alleged—the loss of religious freedom entailed in termination of "a nursery school that teaches a unique Hassidic tradition" (Pl.Reply Br. at 4)—presumably cannot be remedied monetarily.

Even assuming however, that plaintiff could successfully demonstrate that, absent the issuance of a preliminary injunction, it would suffer irreparable constitutional injury, I am not satisfied that plaintiff has carried its burden with respect to the other essential predicate to injunctive relief: a likelihood of success on the merits or sufficiently serious questions going to the merits plus a decided tipping of the equities in plaintiff's favor. This is true with respect to both plaintiff's First and Fourteenth Amendment claims.

*Plaintiff's Free Exercise Claim*

In cases alleging violations of the Free Exercise Clause of the First Amendment, a court is obligated to consider and accommodate competing, constitutionally grounded interests: an individual's right to practice his or her religion freely and the state's interest in exercising its powers in pursuit of important governmental objectives. Clearly, if the explicit or implicit purpose of a law is to regulate religious beliefs, to impede the observance of all religions or a particular religion, or to discriminate invidiously between religions, that law cannot pass constitutional muster. *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); *United States v. Middleton*, 690 F.2d 820, 824 (11th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983). The more usual circumstance, however, is the state's enactment of a law intended to further a secular objective but which has a detrimental impact or burdensome effect on religious observance.

The cases addressing alleged infringements of the Free Exercise Clause may be loosely, but usefully, categorized as falling into two camps. In some instances, the act of complying with a statute in itself constitutes a violation of the individual's religious beliefs and noncompliance may subject him to criminal or monetary sanctions or the loss of a significant privilege or benefit. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory high-school attendance contrary to Amish religious beliefs); *Dennis v. Charnes,* 571 F.Supp. 462 (D.Colo. 1983) (mandatory driver's license photograph violative of plaintiff's belief in Biblical injunction against creating graven image); *Quaring v. Peterson,* 728 F.2d 1121 (8th Cir.1984) (same); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (denial of unemployment benefits to Seventh Day Adventist who refused to work on Saturday sabbath). In other instances, as here, the alleged burden on religious freedom is more attenuated: although compliance with the challenged regulation makes the practice of one's religious beliefs more difficult, it is not inherently inconsistent with those beliefs. Plaintiff Beth Yitzchok does not argue, presumably, that the act of obtaining a certificate of occupancy or of equipping its synagogue with certain fire-safety devices contravenes any tenet of the Jewish faith, as, for example, a statutorily mandated departure from Talmudic dietary laws would.

▮ These distinctions assume practical importance when a court is put to the task of weighing the asserted governmental interest furthered by a challenged statute against the burden on free exercise of religion. As recently stated by the Supreme Court: "Not all burdens on religion are unconstitutional.... To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." *United States v. Lee,* 455 U.S. 252, 257–59, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). The Court's task, accordingly, is to balance "the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Grosz v. City of Miami Beach, Florida,* 721 F.2d 729, 734 (11th Cir.1983). When a statute is in direct and irreconcilable conflicts with a religious belief, the burden imposed on religious freedom is obviously at its greatest. When, however, the state's exercise of its regulatory powers makes the practice of one's religion more expensive or otherwise problematical, courts have been far more reluctant to circumscribe the exercise of state authority. In *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961), the Supreme Court acknowledged this distinction, observing that where "resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution," the "accommodation between the religious action and the exercise of state authority is a particularly delicate task...." *Id.* at 605, 81 S.Ct. at 1147. The task is less delicate, however, where, as here, the law simply regulates a secular activity and, as applied to plaintiff, operates so as to make more practically difficult the practice of its religion. *Id.* In such cases, the burden on religion must be viewed as relatively less onerous. *See, e.g., Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of Lakewood, Ohio,* 699 F.2d 303 (6th Cir.1983).

▮ The burden on the state's asserted interest, should it be required to alter its statute or create religious exemptions, depends upon the importance of the concerns embodied in the statute and the availability of an alternative nonburdening means of achieving the same end. Obviously, if the state can effectuate its policy in some other manner, the imposition on religious freedom is unjustified. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As articulated by one court, "[w]here the government suffers no burden in changing its actions to accommodate religious conduct, any sectarian interest re-

gardless of how lightly it weighs wins the balancing." *Grosz, supra,* 721 F.2d at 734.

■ But where either the state's interest or the asserted religious interest is bound to suffer by virtue of an accommodation between the two, the importance of the burdened interest and burdened religious practice, and the relative degree of impairment, must be weighed. The state may justify even a substantial limitation on religious liberty "by showing that it is essential to accomplish an overriding governmental interest." *United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). The requisite showing has alternatively been described as "a compelling state interest," *Thomas v. Review Board,* 450 U.S. 707, 717, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981); *Quaring, supra,* 728 F.2d at 1126, or "those interests of the highest order...." *Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533. If, however, the free exercise burden is relatively light, as it is here, "a whole range of government interests can justify burdening religion, the requisite level depending upon the significance of that burden." *Grosz, supra,* 721 F.2d at 738. *See Johnson v. Robison,* 415 U.S. 361, 385, 94 S.Ct. 1160, 1174, 39 L.Ed.2d 389 (1974) (government's interest in denying veteran's educational benefits to conscientious objector found to be of "a kind and weight" sufficient to justify "incidental burden" on religious freedom).

Necessary to an assessment of the Town of Ramapo's interest in enforcing its zoning requirements is an understanding of exactly what regulations are involved. This has been, at least from the Court's perspective, an area of considerable confusion from the inception of this litigation. Much of the controversy between the litigants has evolved into a dispute over the nature of the regulations the Town seeks to impose and their applicability to plaintiff's premises. Plaintiff has consistently sought to characterize the dispute as involving the Town's insistence on compliance with relatively technical aspects of its zoning law, such as the control of "traffic patterns ... or congestion in the area" (Pl.Br. at 12) or "requirements relating to a setback" (Pl. Reply Br. of Feb. 24, 1984, at 4), and has argued that such concerns are minimal as applied to its small congregation, none of whose members are permitted to drive an automobile to services on the Jewish sabbath or religious holidays. In support of its argument, plaintiff cites to cases holding that a proposed religious use of property should be accommodated unless it is "convincingly shown that it will have a direct and immediate adverse effect upon the health, safety or welfare of the community." *Holy Spirit Association for Unification of World Christianity v. Rosenfeld,* 91 A.D.2d 190, 458 N.Y.S.2d 920, 922 (2d Dept.1983), quoting *Matter of Westchester Reform Temple v. Brown,* 22 N.Y.2d 488, 494, 293 N.Y.S.2d 297, 302, 239 N.E.2d 891, 895 (1968).

Plaintiff's argument depends, obviously, on the accuracy of its characterization of the ordinances involved. Defendant vigorously disputes this characterization and argues that health, welfare, and safety concerns are at issue here and represent a governmental interest sufficiently compelling to justify enforcement of its zoning law. As stated by counsel for defendant at oral argument:

"I wouldn't be here, or we wouldn't have had the plaintiff into court in the first instance had this been a question of setback. We are not talking about technical violations of whether a side yard should be 50 feet, a front yard 75 feet. We are talking about the lives of children."

(Hearing Tr. at 33–34).

Given these contrary views, a review of the regulatory context of this action is an essential first step in balancing the interests involved. Initially, the Town of Ramapo submitted to the Court three certificates of occupancy that have been obtained over the years for the premises in question. They indicate that the permitted use is as "a one family dwelling with a garage attached." (Wren Aff. of Nov. 2, 1983, ¶ 3, Ex. A). As stated in the affidavit of Gor-

don Wren, Jr., Assistant Building Inspector for the Town:

"The Zoning Law of the Town of Ramapo is very clear in requiring a certificate of occupancy for a religious school and synagogue. My inspection of these premises showed that there was a clear hazard, which placed children of very tender years in extreme jeopardy in the event of a fire or emergency. There were some single station heat detectors that are inadequate for the proper protection of the occupants. Requirements in an operation of this type would be for a complete approved fire detection system hooked up directly to the Fire Department, which would meet all National Fire Protection Association requirements."

(*Id.* at ¶ 7).

At the hearing held before this Court, counsel for plaintiff challenged Wren's assertion that certain fire hazards exist on the synagogue premises, noting that "to this date no fire or safety violations have ever been issued against the premises by the town of Ramapo." (Hearing Tr. at 19). This prompted a supplemental affidavit from Wren stating that, in issuing a criminal summons for the broader violation of operating a nursery school without a certificate of occupancy, "fire safety was my primary concern." (Wren Aff. of Nov. 10, 1983, ¶ 11). Wren further averred that fire safety violations do exist, and stated specifically that "The Town Code requires an automatic alarm and fire detection system, among other requirements, for nursery schools or day care centers." (*Id.*, ¶ 11). According to Wren, if an application is made for a certificate of occupancy permitting use as a synagogue or nursery, "a fire inspection would be mandatory and there are regulations adopted by the Town of Ramapo concerning houses of worship and nursery schools." (*Id.*, ¶ 8). When asked by the Court what body of rules or regulations sets forth the safety provisions plaintiff is obligated to comply with in the Town of Ramapo to obtain a certificate of occupancy, counsel for defendant responded: "We have adopted the New York State Code—New York State Fire Code." (Hearing Tr. at 41).

The Town further represents to the Court that if plaintiff obtains a certificate of occupancy for use as a synagogue, "a nursery school should be considered an accessory use and plaintiff would be entitled to that use." (Def. Br. in Opp. at 4). In response to this admission, plaintiff argues that, under the pertinent regulations, the use of the premises for a synagogue is a use permitted as of right; accordingly, no new certificate of occupancy is needed and the nursery school is entitled to continue in operation as an accessory use. Pursuant to Section 376–31, Table of General Use Requirements for the Town of Ramapo, "Churches and similar places of worship and buildings for religious instruction" are "uses permitted by right." (Pl. Reply Br. of Dec. 5, 1983, Ex. A). At a conference held before this Court, counsel for defendant agreed that use of the premises as a synagogue is a use permitted by right. However, although plaintiff would not be denied a certificate of occupancy because of its intended use of the premises, it would nevertheless be subject to compliance with the regulations set forth in the New York State Uniform Fire Prevention and Building Code. In addition, defendant reiterated that plaintiff would need to obtain site plan approval. Asked by the Court to elaborate on this requirement, as well as the fire and safety standards applicable to the premises, defendant stated in a supplemental affirmation as follows:

"The zoning laws of the Town of Ramapo require a site plan approval with construction completed in agreement with that plan. § 376–100....

"All residential districts of the Town permit as a 'Use Permit by Right' synagogues.... In this zone, the minimum area required is two acres with a lot width of 200 feet. There may be required side setbacks which would then require that the lot would need to be wider and larger. The plaintiff would have to appeal to the Zoning Board of Appeals for any relief in this area. This

site is well under 50% of the lot size required."

(Chronin Aff. of Jan. 31, 1984, ¶¶ 3–4).

With respect to the fire standards applicable to the building if used as a synagogue, nursery school, and residence, the governing statute is the New York State Uniform Fire Prevention and Building Code ("the Code"). (Wren Aff. of Feb. 1, 1984, ¶ 3). According to defendant, because plaintiff's building was initially constructed as a one-family dwelling, it is deficient in a number of ways with respect to the mixed use contemplated. Citing to the Code, Assistant Building Inspector Wren avers that plaintiff would be required to submit a set of professionally prepared construction drawings demonstrating compliance with various fire-safety-related structural features, including, but not limited to, a fire-resistant wall between the garage and synagogue (id., ¶ 5); a proper fire enclosure for the building's heating equipment (id., ¶ 6); an approved means of egress from the synagogue and school area (id., ¶ 7); and private emergency lighting, portable fire extinguishers, smoke and fire detectors, and a fire alarm system connected to Rockland County Communications Center (id., ¶ 8). Plaintiff would also, according to Wren, be required to submit to the Town a fire evacuation plan and to conduct regularly scheduled fire drills.

If, in fact, these are the regulations applicable to plaintiff's premises, I would be loathe to grant the injunctive relief plaintiff seeks in the face of alleged noncompliance with unquestionably important safety requirements. Plaintiff contends, however, that the regulations cited are not relevant to its premises because Congregation Beth Yitzchok is composed of, at most, thirty members. Plaintiff argues that a synagogue is an "area of public assembly," which is defined in the definition section of the Code as follows:

"An area of public assembly includes a building or portion of a building used for gathering together fifty or more persons for amusement, athletic, civic, dining, educational, entertainment, patriotic, politi-

cal, recreational, religious, social or similar purposes, the entire fire area of which it is a part, and the means of egress therefrom."

Accordingly, plaintiff argues, because its membership falls below that level, "the intricate details of the [Code] ... are not applicable to Beth Yitzchok." (Pl. Reply Br. of Feb. 24, 1984, at 5).

Asked by the Court to respond to this specific contention (Letter of April 23, 1984), defendant inexplicably ignored the Court's directive and, in a baffling and largely irrelevant letter, addressed only an additional submission by plaintiff regarding a local fire protection equipment ordinance. (Chronin letter of May 9, 1984). No attempt was made to dispute plaintiff's alleged exemption from the strictures of the Code. Accompanying this unhelpful and unilluminating correspondence, however, was a copy of the Code, apparently submitted in the hope that the Court would do defendant's work for it. I have done so, and am not persuaded that the Code can be read as plaintiff suggests.

As I construe the Code, a synagogue is classified as a C5.4 use, a sub-group of the "C5 Assembly" group (Code §§ 701.4e, 703.6d), while plaintiff's nursery school is a C6.1 use, a sub-group of the "C6 Institutional" group (Code §§ 701.4f, 703.7a). As such, the building is subject to the regulations applicable to those sub-groups. There is nothing in the Code to suggest that the C5.4 sub-group—described only as "churches, synagogues, mosques, and similar places of worship"—is limited to any minimum number of attendees. The exemption plaintiff has created for itself is illogically premised on the assumption that because a particular term—"area of public assembly"—is defined in the Code as an area used for gathering together fifty or more people, plaintiff's synagogue is somehow outside the regulatory scope of the Code. This conclusion, which may be attributable to the fact that plaintiff did not have access to a complete copy of the Code at the time it submitted its final brief, must be deemed a non sequitur.

Perusal of the Code demonstrates that the term "area of public assembly" is used to designate those C5 category buildings or portions of buildings subject to the fire safety regulations set forth in Article 6 of the Code: "Fire Safety in Areas of Public Assembly." (Code, ¶¶ 790–794). In short, special concerns arise in areas accommodating more than fifty persons and special regulations govern those areas. Notably, defendant has not suggested that these requirements apply to plaintiff's use of its premises as a synagogue or nursery school. However, plaintiff is not exempt from the various other fire-safety provisions governing all C5 occupancy, as set forth in Article 5, "Space and Fire Safety Requirements, General Building Construction," or Chapter C, "Fire Prevention Code." Indeed, Table IX–765 of the Code, for example, which sets forth the minimum number of exits required in buildings of Group C5 occupancy, explicitly refers to areas with a capacity of "Less than 51." Further evidence of the distinction between C5 occupancy and areas of public assembly is found in § 765.-5a–4 of the Code, which requires "exit doors to the exterior of buildings of group C3.3, C4.3 and C5 occupancy," but which further requires that "exit doors from an area of public assembly ... be equipped with approved fire exit bolts...." In short, it appears on the record before me that the fire-safety requirements set forth in the Wren affidavit of February 1, 1984, are fully applicable to plaintiff's premises.

■ Having determined that certain fire and safety-related regulations are, contrary to plaintiff's view, at issue here, I must conclude that public safety, health and welfare is at least one objective underlying the Town's interest in enforcing the challenged ordinance. Such an interest is of a magnitude to justify even substantial inroads on the free exercise of religion and clearly outweighs the indirect and seemingly remediable burden on plaintiff's religious liberty. "[W]hile the freedom to harbor religious beliefs is absolute, the freedom to engage in religious practices is not.... [Such] practices are subject to regulation for the protection of society." *Rosenfeld,*

*supra,* 458 N.Y.S.2d at 925. As stated by Judge Werker:

"Because of the extreme significance attached to the state's exercise of its police power in the zoning area, *Young v. American Mini Theatres, Inc.,* 427 U.S. [50] at 80 [96 S.Ct. 2440 at 2457, 49 L.Ed.2d 310 (1976)] (Powell, J., concurring), the law has evolved to the point of recognizing that when in conflict with legitimate zoning concerns as public safety, health and welfare, the first amendment guarantee of religious expression cannot be viewed as absolute. Reasonable accommodations constituting incidental infringement upon religious expression are constitutionally permissible when legitimate conflict arises."

*Holy Spirit Association v. Town of New Castle,* 480 F.Supp. 1212, 1216 (S.D.N.Y. 1979).

Two recent appellate decisions are instructive. In *Grosz v. City of Miami Beach, Florida,* 721 F.2d 729 (11th Cir. 1983), plaintiff challenged enforcement of a municipal ordinance that prohibited him from using his single-family residence as a small synagogue or "shul" in an area zoned for exclusively residential use. The asserted governmental interest was protection of the zone's inhabitants from "problems of traffic, noise and litter" and to "preserve a coherent land use zoning plan." *Id.* at 738. Unlike the situation here, the ban was absolute and would require plaintiff to find another location to hold services. Plaintiff was not, in other words, accorded an opportunity to continue to use his residence as a synagogue subject to compliance with certain regulations, nor was the City's asserted interest as obviously keyed to health and safety concerns. Even so, the Eleventh Circuit concluded that the balance tipped perceptibly in the City's favor—that is, the City's asserted interest outweighed the burden upon plaintiff's free exercise interest. The court observed as follows:

"Miami Beach does not prohibit religious conduct per se. Rather, the City prohibits acts in furtherance of this conduct in

certain geographical areas.... Appellees do not confront the limited choice of ceasing their conduct or incurring criminal liability. Alternatively, they may conduct the required services in suitably zoned areas, either by securing another site away from their current house or by making their home elsewhere in the city."

*Id.* at 739.

In *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303 (6th Cir.1983), the Sixth Circuit concluded that a municipal zoning ordinance which prohibited the construction of church buildings in virtually all residential districts did not violate the free exercise clause of the First Amendment. The court's rationale for so holding was that the ordinance "does not pressure the Congregation to abandon its religious beliefs" but rather places a "financial and aesthetical imposition on the Congregation" by virtue of the fact that it would be required to purchase property in a more expensive, and aesthetically less appealing, commercial zone. *Id.* at 307.

 The burden on plaintiff Beth Yitzchok is far less substantial than in either *Grosz* or *Lakewood,* and the City's interest more compelling. The Town is neither prohibiting religious conduct per se nor prohibiting it on plaintiff's premises. Rather, it is insisting that plaintiff comply with certain regulations mandated by its use of the premises as a synagogue and nursery school. In these circumstances, I cannot conclude that plaintiff has demonstrated a likelihood of success on the merits with respect to its First Amendment claim, nor a balance of hardships tipping in its favor sufficient to invoke the "serious questions" prong of the preliminary injunction standard.

 With respect to the latter inquiry, I continue to be troubled by plaintiff's failure to pursue other available remedies to accomplish its objective of operating a religious nursery school. The Town alleges that plaintiff has made only one "half-hearted attempt" to obtain a certificate of occupancy and has not applied to the Zoning Board of Appeals or Planning Board for other relief it would be entitled to. (Def.Opp.Br. at 3–4; Chronin Aff. of Nov. 2, 1983, ¶¶ 5, 7). Plaintiff alleges in response that its attempt to obtain a certificate of occupancy was "purposely thwarted" by the Town Clerk. (Pl. Reply Mem. at 4; Rottenberg Aff. ¶ 7). While I suspect that both parties in this matter have been derelict in their efforts to resolve this matter amicably, on the record before me I must conclude that plaintiff had and continues to have avenues open to it that it chooses not to pursue. While I appreciate that plaintiff's position in this matter has consistently been that Beth Yitzchok is not obligated to comply with the certificate of occupancy requirement, the availability of a means to keep its school in operation must weigh in the calculus of hardships considered in the context of a preliminary injunction motion.

*Plaintiff's Fourteenth Amendment Claim*

 Plaintiff also alleges that the "disparate and selective enforcement" by the Town of Ramapo of its regulations constitutes an equal protection violation. On the record before me, I cannot find that plaintiff has carried its burden of demonstrating a likelihood of success on the merits with respect to this claim. Although plaintiff alleges that other nursery schools in the Town of Ramapo not affiliated with the Jewish faith continue to operate without a certificate of occupancy, it offers no proof in support of this allegation. Rabbi Rottenberg states only that:

"Although plaintiff does not have access to all necessary information to determine which schools have proper licensing, upon information and belief Camphill Day Camp Nursery located on Camphill Road, Pomona, New York and Creative Corners, located at 45 Old Route 202, Spring Valley, New York do not have proper licensing and certificates."

In response, the Town asserts that Creative Corners Nursery is not located in the Town of Ramapo, but rather is subject to

whatever zoning and fire-safety regulations the Village of Pomona sees fit to impose. (Wren Aff. of Nov. 2, 1983, ¶ 11). Although there is no Camp Hill Nursery School, defendant suggests plaintiff may be alluding to another nursery school located on Camp Hill Road, which is properly licensed. (*Id.*).

Preliminary injunctive relief is an "extraordinary and drastic remedy" which is granted only in those instances where movant carries its burden of persuasion with respect to both irreparable injury and probable success on the merits. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983). Beth Yitzchok's as yet speculative and unsupported assertion regarding disparate enforcement of zoning regulations in the Town of Ramapo is not sufficient to ground the relief it seeks.

### III.

*Conclusion*

For the reasons stated, plaintiff's motion for a preliminary injunction is denied. Counsel for both parties are directed to comply with the terms of this Court's pretrial scheduling order, a copy of which is enclosed.

It is SO ORDERED.