**UNITED STATES of America, Plaintiff,**

v.

**VILLAGE OF AIRMONT, Airmont Civic Association, Ralph Bracco, in his capacity as Mayor of the Village of Airmont, John Layne, Raymond Kane, Charles Calotta and Ronald Sabo, in their capacities as trustees of the Village of Airmont, Defendants.**

No. 91 Civ. 2550 (GLG).

United States District Court,
S.D. New York.

Dec. 15, 1993.

As Amended Dec. 16, 1993 and
Dec. 20, 1993.

Mary Jo White, U.S. Atty., S.D.N.Y., U.S. Courthouse Annex, One St. Andrew's Plaza, New York City (Sara L. Shudofsky, James L. Cott, of counsel), for plaintiff.

Dorfman, McCormack, Lynch & Phillip, Nyack, (Dennis E.A. Lynch, of counsel), Thurm & Heller, New York City (Brian S. Sokoloff, of counsel), for all defendants.

### OPINION AND MEMORANDUM OF DECISION

GOETTEL, District Judge.

This action, brought by the Government under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 as amended, 42 U.S.C. §§ 3601 *et seq.*, concerns allegations of anti-Semitism and discrimination against Orthodox and Hasidic[1] Jews. To understand aspects of this decision, some discussion of Judaism, its divisions and practices, is necessary.

### Orthodox Judaism

Judaism is a very old religion. Its practices go back thousands of years. These practices include several worship services during the Jewish Sabbath (called the Shabbos in Yiddish) which commences an hour before sundown on Friday and ends with sundown on Saturday. In order for Jews to pray, they must have a "minyan," a group of ten adult males, although sometimes a youth can be substituted.[2] During the Sabbath, there

---

1. Sometimes spelled Chasidic.

2. Judaism, like many ancient religions, appears male oriented. Indeed, if Orthodox Jews have

are a number of restrictions on what Orthodox Jews can do. Most pertinent to this case is a prohibition against riding in a vehicle. Orthodox Judaism also imposes strict and complicated dietary laws, requirements concerning dress and hair style for men, and the need to eat only Kosher food. Furthermore, Orthodox Jews often have a strong desire, whenever possible, to educate their children in parochial Jewish schools known as Yeshivas.

Those Jews who follow these ancient and, at least in modern times, inconvenient, practices are referred to as "Orthodox." Within Orthodox Judaism, there are certain sects which may be considered "ultra Orthodox." Most common among these are the Hasidics. Hasidics are known for their distinctive dress style. Although the nature of their dress suggests an ancient origin, in fact, Hasidism developed only a couple of hundred years ago in Poland. While Hasidic dress and liturgy differs from that of Orthodox Jews, the major difference between Hasidics and the Orthodox appears to lie in the position of the Rabbi. An Orthodox Rabbi is engaged by a congregation which retains the power to discharge him. He is a teacher and a spiritual leader, but exercises no direct secular control over his congregation. By contrast, in Hasidic sects, there is a "Grand Rabbi," a position which in some circumstances seems to be family dominated or hereditary. The Grand Rabbi exercises substantially more control over his congregation than an Orthodox Rabbi.

In the United States, most religious Jews are not Orthodox. They attend either Conservative or Reform temples. So far as the evidence indicated, there is no difference in the religious beliefs of these groups from the Orthodox. However, there are substantial differences with respect to practices and many of the practices of the Orthodox mentioned earlier are not followed by Reform and Conservative Jews. Orthodox witnesses in this case referred to the Conservatives and Reform Jews as "not observant" and "as assimilated." [3]

The Orthodox religious practices referred to above seem to be at least as applicable to the Hasidic. The observation of many of these practices is dependent upon the location of other Orthodox Jews and kosher stores and schools in the community. A large urban area will usually have a sufficiently dense population that, although Orthodox are a very distinct minority group, there will often be sufficient numbers to support a synagogue and related institutions and facilities. In rural and suburban areas, however, where the population density is much lower, numbers can be a problem. There consequently seems to be a tendency for the Orthodox, and in particular the Hasidics, to congregate in communities where their percentage of the population is relatively great.

### Ramapo

One of these Orthodox/Hasidic centers is the Town of Ramapo in Rockland County. Rockland County may be the smallest county in New York State, but it appears that Ramapo is geographically its largest town.[4] The Town of Ramapo has had a divisive history. Twelve villages have broken away from the Town and incorporated themselves within its borders.[5] Six of these villages broke away during the 1980's. Much of this disenchantment with the Town had to do with its zoning and lack of enforcement thereof. The two last villages to be formed were the Village of Kaser, an exclusively

---

children at home, on Friday night women are expected to be preparing meals rather than attending the worship service.

3. In some instances, the differences are rather dramatic. During Orthodox services, the men cannot see the women, who are kept segregated at the back. One Orthodox witness testified that it is improper for an Orthodox male to hear any woman sing other than his wife. In a Reform temple, the congregation is not gender segregated and, indeed, both the Rabbi and the Cantor can be women.

4. However, the western half of the town is occupied by a state park and has few inhabitants.

5. In an effort to stop the village formation movement, the Town of Ramapo passed legislation giving its supervisor greater power to invalidate applications for village incorporation. This legislation, however, was ultimately thrown out by the New York courts.

Orthodox/Hasidic village, and the Village of Airmont, which is one of the defendants in this action.

The major zoning problem in Ramapo was multiple-family housing in areas zoned for single family residences. These violations were purportedly common throughout the 1980's and related mostly to the Hasidic population.[6] On October 18, 1986, the Town of Ramapo rezoned to create a multiple-family housing zone in the central Monsey area.

Another zoning problem developed in the Town during the mid 1980's, when the Town, which had always had a substantial Jewish population, experienced a dramatic increase in the number of Orthodox and Hasidic residents. Numerous small "shteebles" were formed as places of worship in Rabbis' homes without obtaining a certificate of occupancy or any zoning approval. Nearby residents complained about their operation. The Town was under substantial pressure to legitimize the operation of these shteebles. Rather than face the problem directly, the Ramapo Town government decided that a political expedient would be to interpret its existing exception to the zoning laws for home professional offices to allow a clergyman to regularly conduct religious services in his home as an accessory use. This interpretation of the zoning code was not popular with those non-Orthodox residents living near them.

There appear to be several reasons for the popularity of shteebles. One is that, since the Orthodox cannot ride on the Sabbath, they prefer having their place of worship as near to their homes as possible. However, even in instances where a traditional free-standing synagogue (or "shul") is within reasonable walking distance, the congregants of a particular rabbi often prefer continuing to worship with him at his home. Also, the cost per congregant is less to support a shteeble than a shul.

### Airmont Civic Association

The Airmont Civic Association ("Civic Association") was formed about 1983 by James Filenbaum, a local attorney, who was inter-ested in being Mayor of the Village of Airmont should it be formed. While the Civic Association had other mundane interests, it began supporting the village movement about 1984. However, in that same year Filenbaum decided to run for office in the Town of Ramapo, and the Civic Association became inactive for a couple of years.

In mid–1986, Jill Tucci and several other women who were members of the Island Lake Swim Club, became dissatisfied with the services they received from the Town of Ramapo. They met informally to discuss the formation of a civic group. Filenbaum, who had lost his bid for public office in the Town, also attended. When the women indicated interest in forming a civic association, Filenbaum told them he already had one and, indeed, was the President of it. During 1986, this group met informally and started supporting the formation of the Village of Airmont. Around the same time, Maureen Kendrick (formerly a defendant in this action in her capacity as Mayor of Airmont) and her cousin, defendant John Layne, became members. The following year, defendant Raymond Kane also joined the Civic Association, and the small core group came to include Stan Dublet, Gay Caroll, Paul Berliner, and Marianne Cucolo.

During 1986, while Ramapo was changing its zoning laws to allow more multiple-family housing in nearby central Monsey, various Civic Association members circulated petitions for the incorporation of a village. Filenbaum continued as President of the Civic Association until February 11, 1988, when he was replaced by Maureen Kendrick. During this period of time, besides assisting the village formation, the Civic Association participated in a number of other local affairs regarding such issues as a senior citizen complex, traffic flow on Route 59, drainage problems, waste collection, a home for the disabled, and utilization of a closed school.

### The Village of Airmont

By 1986, the Civic Association had a map drawn for the proposed boundaries of the

---

**6.** The Government argues that there is no particular basis for believing that Hasidic families violate residential zoning laws, and the defendants offered no evidence to explain why they believed this occurs among Hasidics.

Village of Airmont. Since the area which was to become Airmont already had villages to the east and west and the State of New Jersey to the south, the only option in selecting the boundaries was what to use as the northern boundary. Initially, the Civic Association considered using a road which angled across the northeast·corner of what later became the Village of Airmont and would have eliminated the areas which gave rise to the litigations discussed below. Ultimately, however, the Civic Association selected the New York Thruway as the northern boundary, since it was a natural geographic separation from the rest of Ramapo.[7]

One of the prime reasons for the.Civic Association's desire to form a village was the power of villages to create and interpret their own zoning code pursuant to New York Village Law § 7–700 *et seq.* On April 16, 1987, petitions to incorporate the Village were approved at a public hearing in the Town of Ramapo. No· opposition was voiced at the hearing. However, a month later an Orthodox resident and real estate developer named Lefkowitz brought an Article 78 petition challenging, on technical grounds, the adequacy of the petition to incorporate. Although the challenge was not successful, by virtue of its filing and the taking of appeals, Lefkowitz prevented the Village from going into operation for a couple of years.

When the *Lefkowitz* litigation was finally terminated, the formation of the Village was put to a vote by referendum, which occurred on January 30, 1989. Although some residents opposed the Village as adding an additional layer of bureaucracy and taxes, and most of the few Orthodox residents apparently voted against it, the referendum nevertheless succeeded by a three to one margin. Again, however, the Village was stymied by another Article 78 proceeding challenging the manner in which the referendum was conducted. This was brought by Mayer Schreiber, an Orthodox real estate developer

and·the contractor for the Friedman synagogue expansion. which is discussed infra. The litigation was supported by various persons who subsequently became plaintiffs in the private litigation also described infra. The proceeding was ultimately dismissed when it developed that Schreiber lacked standing since he was not a registered voter.[8] Nevertheless, with appeals, the litigation prevented the Village from accomplishing the ministerial acts, which would commence its operation, for a period of almost two and a half years.

### *The Formation of Orthodox Congregations in Northeast Airmont*

In the fall of 1986, a real estate developer named Michael Tauber purchased property in the northeast area of what is now Airmont and filed plot·plans for two sections that later became known as Park Avenue Estates and Joy Acres. This occurred at about the same time as the Town of Ramapo changed its zoning laws to permit a zone for multiple-family housing a little north of the area that subsequently became Airmont. He advertised his development in Orthodox Jewish publications in New York as the construction of a "Torah Community." However, actual construction of houses did not commence for another year or two. During that period of time, another developer purchased property slightly to the south of Park Avenue Estates and Joy Acres which has never been developed. During 1988 and the first half of 1989, Orthodox and Hasidic Jews who later became plaintiffs in a private plaintiffs' suit (hereafter referred to as the "Sternberg litigation") all bought houses and moved into the first section of the Tauber development called Park Avenue Estates. The early residents walked a mile or more to a home synagogue north of the New York Thruway. They told similar stories of harassment of an anti-se-

---

7. A small sliver on the western border was omitted when the residents indicated they preferred not being a part of the Village. In addition, a cemetery area on the New Jersey border also had to be eliminated to keep the Village within the maximum size permitted by state law for villages.

8. The defendants in this action contend that he was not even a citizen, but this collateral issue was not proved.

mitic nature during their walk from passing anonymous motorists.[9]

During the latter part of 1989, Rabbi Yitzchok Leblanc–Sternberg (who is Hasidic) organized a congregation of Orthodox Jews in the Park Avenue Estates area. He thereafter made application to the Town of Ramapo to use his home as a house of worship pursuant to the Ramapo interpretation of a clergyman's use of a home professional office. This application came on to be heard by the Town of Ramapo Planning Board on November 2, 1989. A heated hearing was conducted with a number of Airmont residents arguing against granting the application and a number of the rabbi's congregants arguing in favor of it. Among those who spoke against the application were Robert Fletcher and Maureen Kendrick. (Kendrick lived quite close to Park Avenue Estates.) The Planning Board initially rejected the application but then granted it upon Rabbi Sternberg's acceptance of a 40 person limitation on the number of congregants. (He and his attorney were not pleased with this limitation but felt it was the best they could do at the time, under the circumstances.)

Shortly after Planning Board approval, defendant Raymond Kane and other members of the Civic Association met with Town of Ramapo officials to object to the home professional office interpretation that could allow as many as 40 congregants to assemble regularly at a home. The Ramapo officials claimed that this interpretation was supported by legislative intent but were unable to provide any written legislative history in that regard. Leaders of the Civic Association argued that applications of this sort should not be considered by the Town but should be withheld for consideration by the Village of Airmont once it was allowed to commence operations.

On the same night that the Sternberg application was heard, Rabbi Chaim Friedman also made a preliminary application for a zoning variance. His congregation lived slightly to the west of Park Avenue Estates and Joy Acres and was comprised of a small group of Orthodox Jews who had had difficulty in obtaining a permanent rabbi. They had been congregating in various homes and moving their place of worship every month or so. The congregation had attracted Friedman to come up from Brooklyn with the promise that they would support the building of a synagogue. The synagogue which Friedman planned was to be built as an adjunct to his home, but because it was to be a fairly substantial structure, it was not being submitted under the home professional office exception. The Ramapo zoning code provides that free standing houses of worship in that area must be built on lots of two acres. However, Friedman's plans were for a piece of property that was slightly below two acres and required a number of other bulk zoning variances.

In this regard, it is worth noting that a few months earlier the Ramapo Zoning Board of Appeals had approved the establishment of a house of worship for 120 congregants in a residential area on a lot of only two-thirds of an acre in an area a couple of miles north of the New York Thruway. That application was bitterly opposed by the residents of that area, none of whom came from Airmont or belonged to the Civic Association. Despite their opposition, the application was approved and the synagogue was built. A next door neighbor to the synagogue testified at some length concerning the disruptions and unpleasantness caused by having the synagogue next door, indicating that it was not so much the worship services on Saturday as it was the numerous affairs held on other days when the attendants could drive, including band music playing into the night and firecrackers going off on a particular Holy Day.

Civic Association members unsuccessfully opposed the Friedman application, but their opposition may have delayed its approval, which did not finally come until January 15, 1991. Later that year, James Montone brought an Article 78 proceeding challenging approval of the Friedman synagogue. It was not until May 1992 that the Town then gave a final approval to Friedman's synagogue.

**9.** These events occurred primarily on Saddle River Road, a busy street running from New Jersey into Central Monsey. The road is the dividing line between Airmont and the village to the east. There was no proof that the harassers were residents of Airmont.

However, they conditioned it upon Friedman obtaining approval or a variance from the New York State Board of Fire and Safety Codes. Friedman did not seek such approval at that time and, indeed, has done so only recently. Instead, as will be noted below, he commenced a lawsuit against the Village and certain individual defendants.[10] Friedman argues that he should not be required to get State approval since appending a synagogue to a home does not constitute a "dual use" so that there should not be safety factors imposed. He blames this Town action on certain individual defendants.

Following the Planning Board approval of Sternberg's applications some of the neighbors and James Montone posted themselves outside Rabbi Sternberg's home to count the number of congregants entering it. Representatives of the Ramapo Building Department also counted congregants on occasion. The Sternberg congregation was outraged by this. While these proceedings were no doubt annoying to Rabbi Sternberg and his congregation, they did not in any way impair the conducting of services or other proceedings by the Rabbi at the Sternberg home.

Although the Sternberg application had been approved by the Town of Ramapo in November 1989 and his shteeble has been in operation ever since, Sternberg's variance was challenged in two Article 78 proceedings supported and paid for by the Civic Association. The first Article 78 proceeding was successful to the extent that the New York State Supreme Court revoked the approval and remanded the matter to the Planning Board for further findings. Following the

second approval,[11] another Article 78 proceeding was commenced on slightly different grounds and it, too, resulted in a reversal of the approval and a remanding for further findings. Finally, on November 12, 1991, the Town of Ramapo Planning Board approved the application for a third time. While Mayor Kendrick of the Village, which by this point had commenced operation, discussed a third Article 78 proceeding, it was never brought.[12]

### Changes in the Airmont Civic Association

The Civic Association's efforts to incorporate a village had taken it to its final stages only to be thwarted by the *Schreiber* litigation. Between 1986 and 1989, the core membership of the Airmont Civic Association changed somewhat and some of the original core group dropped out. The original concern about multi-family housing in residential areas was coming to be overshadowed by a concern about home synagogues. However, with the emergence of the Rabbi Friedman application, which did not rely on the Ramapo interpretation of the home professional office use, a new anti-neighborhood synagogue feeling started to develop. Defendant Robert Fletcher became active in the Civic Association in the middle of 1989. At the end of the year, he campaigned to be on the Board of Directors and after the Directors were elected and chose officers, campaigned to be President. (This apparently was the first time there had been any such internal partisan dispute over officers.) Fletcher defeated defendant Raymond Kane, who was

10. Rabbi Friedman and his congregation have had a number of other problems. Before Friedman arrived, two earlier rabbis had failed to develop the congregation the way they had hoped. Friedman himself, in several of his earlier employments, had been unsuccessful in developing religious oriented enterprises due to financial problems. In his activities as rabbi of the present congregation, he had encouraged the donation of used cars to his synagogue (allowing the donors to get charitable deductions based on their belief as to the value of the cars) with Friedman reselling the cars to dealers for whatever he could obtain for them. The money obtained was to be used for his synagogue. Unfortunately, this activity required the storing of numerous cars on his premises (we gather that the donations came from not only his congregants

but also from Orthodox Jews from other areas) with the result that he was served with zoning violation notices, compelled to pay a fine, and required to cease his operations.

11. The petitioner in that proceeding was subject to a boycott of his car sales business as a result of his bringing the action and, consequently, did not pursue it further. The second Article 78 proceeding was brought by other local residents.

12. The curious thing about these Article 78 proceedings was that they were brought on purely technical zoning grounds. They never raised the question of whether a home synagogue could properly be approved as an adjunct to a home professional office.

then selected as Vice–President by acclamation. Other officers were appointed by acclamation as well.

Fletcher is an extremely outspoken person and quite politically active. He was joined in the Association by a close political ally, Nicholas Vertullo, who was later appointed to the board. Along with James Montone, the three vigorously opposed converting residences into houses of worship even on two acre plots. Other remaining members of the old core group disagreed with this approach.[12a] They also disliked Fletcher's domineering leadership style. Efforts by Kane to have Fletcher soften his approach were unsuccessful. In early 1990, several of the old guard of the Civic Association, such as Filenbaum, Dublet and Caroll, resigned. They joined a newly formed group with the acronym "ACTION" (Airmont Citizens to Improve Our Neighborhood). This group also favored strict enforcement of zoning laws but did not necessarily view the Friedman synagogue as being a violation of the zoning laws. At least some of the departing persons had begun to suspect that Fletcher's vehement opposition to residential houses of worship was not caused solely by the usual zoning concerns, but had an anti-Orthodox underlay to it.

On February 8, 1990, the Town Zoning Board of Appeals granted Friedman the variances he had requested over the objections of some Civic Association leaders. However, as indicated earlier, the problems with the synagogue were not resolved at that time and were further complicated by Montone's filing of an Article 78 proceeding in July 1991. Starting in mid–1990, the Civic Association became somewhat inactive, although it revived in early 1991 when the *Schreiber* litigation ended and the election of Village officials became possible. The Civic Association ran a slate of candidates as did the ACTION group and another independent group.

### Formation of the Village

On April 10, 1991, the Secretary of State of New York State signed the certificate of incorporation for the Village of Airmont. On May 16, 1991, the elections for the Board of Trustees of the Village of Airmont were held with the Civic Association slate getting approximately half the vote and the other two tickets splitting the remainder. Maureen Kendrick was elected as Mayor; Fletcher, Layne, Vertullo and Marianne Cucolo were elected as Trustees. Defendant Raymond Kane, who had run on one of the other tickets, was defeated. No sooner was the Civic Association slate elected than they had serious fallings out among themselves. Like most small villages, services were largely contracted out, and the major consideration for the new village was the zoning law, which had been a principal reason for its formation. Fletcher and Vertullo favored the adoption of the Ramapo Zoning Code in its entirety, although they obviously did not intend for Ramapo's home professional office exception interpretation to be adopted in the Village. The other Board members believed that a full study should be made by professional zoning planners and ultimately a commission to proceed in that fashion was formed. Consequently, the Village had no zoning code until 1993.

When the Zoning Commission, with the help of its professional planners, completed their work, a public hearing was held to consider the new zoning code. No one appeared at that hearing to object to the code or to request additional provisions assisting the practice of religion by Orthodox Jewish residents. Consequently, the Village Board adopted the zoning code on January 11, 1993.

The new code is basically similar to the Ramapo Zoning Code. A couple of minor changes were made in the home professional office provision, which arguably could be taken as a signal for a different interpretation but do not by their terms require it. A five member Planning Board was appointed, which included James Montone. A seven member Zoning Board of Appeals was appointed, including former Civic Association leader Jill Tucci, and a brother-in-law of Raymond Kane. To date, neither the Plan-

**12a.** Many of the original core group were Jewish or had Jewish spouses, albeit they were not Orthodox. A few of the Civic Association members were Orthodox but most of them seemed to have joined in order to monitor its activities.

ning Board nor the Zoning Board has had any applications with respect to synagogues. The present zoning code provides for neighborhood places of worship in R15 zones with no requirement of two acres. However, the R15 zones in Airmont are fairly small. Generally speaking, other than R15 zones, a two acre lot is required, but there are numerous vacant two acre lots in the Village of Airmont. Specifically, in Joy Acres, which was taken over by a builder named Joseph Herskowitz from Michael Tauber, there are two adjacent lots which Herskowitz has offered to sell at cost for the preparation of a freestanding synagogue and which he believes meet all zoning requirements.[13]

### The Lawsuits

On April 12, 1991, the Sternberg plaintiffs filed a lawsuit naming the Rabbi, his wife, and a couple of congregants, as well as the incorporated Park Avenue Synagogue, as plaintiffs. They sued under the Fair Housing Act and a number of civil rights statutes, claiming constitutional violations. They sued the then-Mayor and four Trustees, as well as a number of other Civic Association members, the Supervisor of the Town of Ramapo, and the Town of Ramapo.[14] The complaint was later amended to drop all of the Civic Association defendants who were not Village Trustees except for Raymond Kane and Paul Berliner (who some time later was dropped from the case). On December 17, 1991, the United States filed this lawsuit solely under the Fair Housing Act against the Village of Airmont and its then-Mayor and Trustees. (The complaint has been amended to name the present officials in their official capacities.) The private plaintiffs' suit and the Government's suit were consolidated for discovery purposes and were ultimately tried together, with the Sternberg suit being presented to a jury. Following a seven week trial, the jury deliberated for a week. In

June of 1992, Rabbi Friedman and some of his adherents filed a separate lawsuit, which is still in the discovery stage.

### Post–Litigation Developments

During the two and one-half years that elapsed from the filing of the first suits to the trial, few new developments of any consequence occurred. The initial Village Board was elected to staggered terms, and therefore, two Trustee positions were up for election in only one year. In the election held on March 17, 1992, John Layne was reelected, defeating defendant Ralph Bracco, and Nicholas Vertullo lost to Raymond Kane. The following month, Marianne Cucolo, whose term had not expired, resigned from the Village Board, which then appointed Mary Ann Lawler to fill out her term. (Lawler had not been a Civic Association member.)

In March 1993, the elections for Mayor and the two vacant Trustee positions were held. Maureen Kendrick and Mary Ann Lawler were defeated. Robert Fletcher did not run for re-election. Ralph Bracco was elected Mayor and Charles Calotta and Ronald Sabo were elected to the two Trustee vacancies. The political split which developed between the Fletcher group and the Kendrick, Kane and Layne group continued but in this election the candidates supported by Fletcher prevailed. The Airmont Civic Association, which had become splintered and inactive, held its last meeting in the middle of 1992. The Civic Association had been named as a defendant in all of the three litigations. Initially, it appeared by counsel but when counsel withdrew (apparently from not being paid) a default was entered against the Civic Association.[15]

The plaintiffs contend that the Village of Airmont has developed a reputation as a community hostile to Orthodox and Hasidic Jews. If it has, it is largely the result of

---

13. One of the plaintiffs' witnesses indicated that he believed the lots to be too steeply inclined to be satisfactory for the building of such a synagogue.

14. This court dismissed the case against the Supervisor and the Town of Ramapo finding that they had no discretion in the approval of the incorporation petition.

15. So far as the evidence showed, the Civic Association, a not-for-profit organization, owned no property and left no assets. The last officers elected resigned about a year and a half ago and the organization is now either non-existent or totally dormant.

these three lawsuits brought against it by the various plaintiffs and the extensive publicity plaintiffs have intentionally generated. Nothing in the evidence presented at trial indicated that there was any substantial difference between the people of Airmont and other Ramapo residents who spearheaded separate movements to incorporate villages within the Town.[16] The founders of other villages also expressed dissatisfaction with the Town's lax zoning years prior to Sternberg's application.

With respect to synagogues, nothing other than the passing of the zoning code mentioned above has occurred which even remotely bears on the issue. Rabbi Sternberg's congregation has continued to meet in the same fashion as before the village was formed, as has Rabbi Friedman's. Rabbi Friedman failed until recently to even apply for State Fire and Building Code approval. It appears that his congregation has a financial problem in building a synagogue of the size already approved by the Town of Ramapo. While they have raised substantial sums of money, they have devoted it to their litigation with the avowed hope of obtaining a multi-million dollar judgment which will more than finance any type of synagogue.

While the Friedman congregation has lost some members, the evidence did not establish that they left in any great number because of the existence of the Village of Airmont. Meanwhile, in the Park Avenue Estates/Joy Acres area, numerous Orthodox families have moved in. Overall, the evidence indicates that the number of Orthodox families has increased since the Village began operating. The earlier housing developments are virtually sold out.[17] Between the Park Avenue Estates/Joy Acres developments and the area occupied by the Friedman congregants there appear to be enough congregants (sixty or more families) to operate a free-standing synagogue on the two plots offered by Herskowitz in Joy Acres. That location is within reasonable walking distance of all of these people but, for various reasons, including their adherence to two different rabbis, there has been no movement in that direction.

Since its formation, no efforts have been made by the Village to interfere with the activities of the Sternberg congregation or the Friedman congregation. In addition, there are other groups in the area who have been meeting and praying without a rabbi and with no building or zoning applications being made.[18] The Village has not challenged these activities. The plaintiffs argue that it is merely the spotlight of these three litigations which has inhibited action.

### The Jury Verdict in the Sternberg Litigation

Following its week of deliberation (the longest in a civil case that this court can recall), the jury returned what appeared to be a compromise verdict. The jury found in favor of all the individual defendants, but found that the Village violated the Fair Housing Act and the right of the plaintiffs to freedom of religion. However, they awarded no damages whatever, not even $1 nominal damages on the Civil Rights claim. In addition, the jury found that the majority of those voting to form the Village were not moved by anti-Orthodox religious bias. (The principal injunctive relief sought by the private plaintiffs was the dissolution of the Village.)

### The Government's Application for Injunctive Relief

In arguing that injunctive relief should be directed against the Village and its

---

**16.** There is, of course, the obvious religious difference from the people of the two villages which are exclusively Orthodox/Hasidic (Kaser and New Square). In this religious sense, they differ also from what is left in the unincorporated occupied parts of the Town of Ramapo, which are heavily Jewish and substantially Orthodox/Hasidic.

**17.** There is, however, to the immediate south another substantial development which has not begun construction which is owned by an Orthodox Jewish builder who is being assisted by a different Orthodox Rabbi.

**18.** Under Jewish law, it is necessary to have ten or more adult males to hold a prayer service but there is no requirement for the presence of a rabbi, although such is obviously desirable when possible.

current Mayor and Trustees, the Government acknowledges that it cannot point to any significant actions taken by them. However, the Government argues, in effect, that the Village was conceived in sin and cannot escape the taint of its illegitimate birth.

The Government arrives at its rather tenuous arguments by stringing together a series of earlier authorities. It argues first that elected officials cannot conceal their motivations by clever or subtle behavior, citing *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir.1974). They cite *Casa Marie, Inc. v. Superior Court of Puerto Rico for the District of Arecibo*, 988 F.2d 252, 257 n. 6 (1st Cir.1993) for the proposition that the discriminatory use of zoning laws is contrary to the Fair Housing Act.[19] But, concerning home synagogues, there has been no substantial change from the zoning laws of Ramapo to Airmont and no applications even presented to its Planning Board. The Government notes that if a defendant ceases illegal conduct after the filing of a lawsuit challenging the conduct that the cessation of the illegality does not prevent the imposition of injunctive relief. *United States v. Oregon Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978 (1952). That is undoubtedly true. However, it assumes prior illegal conduct which, from the standpoint of the Village and its Trustees in their official capacity, has not been established.

Faced with this problem, the Government resorts to the claim that "an injunction may issue to prevent future wrong, although no right has yet been violated," citing *Swift & Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928). That language does appear in *Swift* but in a context totally different from this. In that case, the Government had sued Swift & Co. under the antitrust laws. The parties thereafter entered into a consent decree providing that the court could entertain, at any time thereafter, any application which the parties might make with respect to it. Four years later the defendant moved to vacate the consent decree, arguing that there had been no case or controversy sufficient to afford the court jurisdiction over the matter under Section 2, Article 3 of the Constitution when the consent decree was entered. It was in response to that argument that the court held that an injunction could issue to prevent future wrong although no right had yet been violated. That principle has nothing to do with the claims of the Government against the Village of Airmont which never entered into any consent decree.

Viewing the evidence in the light most favorable to the Government, we can foresee that the Planning Board and the Zoning Board of Appeals (to the extent the matter might be submitted to it) will not adopt the Ramapo interpretation of the home professional office exception.[20] It may also be true that the absence of actions by the Village and its officials adverse to Orthodox and Hasidic Jewish interests has been due in part to the existence of the three lawsuits. However, it may equally be true that, having learned the extreme costs of litigation from these lawsuits, the Village will have no interest in taking actions against residential synagogues or doing anything else which has an adverse effect on the availability of housing for Orthodox or Hasidic Jews. Clearly, if there is any action taken in the future which violates their rights, the United States Government and other plaintiffs will not be timorous about suing. Consequently, we see no basis or need for injunctive relief. Moreover, were we to grant injunctive relief, it would not be in the manner requested by the Government.

---

**19.** However, 42 U.S.C. § 3607(b)(1) allows restrictions on the maximum number of occupants permitted to occupy a dwelling which was the aspect of the zoning laws which first gave rise to the Village's concerns.

**20.** There are two contradictory arguments that can be made on that issue. One is that since the code provisions are quite similar, it was the intent of the Village Board that it be interpreted in similar fashion to that of the Town of Ramapo.

The contrary argument would be that, since many of the Village Trustees had clearly voiced their opposition to the Ramapo interpretation and added a few variations to the provision, including one which stated that actions allowed under the home professional office use should not be those which would change the character of the neighborhood, the legislative intent was to the contrary.

■ The Government's requests fall into three categories. The first part would enjoin the defendants from denying the constitutional and legal rights of persons on account of their religion. Such injunctive relief is unnecessary since it would be enjoining acts which are already illegal. The second portion of their request for injunctive relief concerns zoning code changes which are drafted in such a manner as to be obviously of benefit only to Orthodox Jews.[21] If the court were to draft zoning code changes with respect to residential houses of worship, the changes would not be confined to those favorable only to the Orthodox.

■ Finally, the third portion of the request seeks "other affirmative relief" which includes a requirement that the Village notify "in advance, counsel for the United States of all meetings of the Village Planning Board and Village Zoning Board of Appeals and ... provide copies of the agendas of those meetings to counsel for the United States in advance of the meetings." The overwhelming majority of matters which come before Planning and Zoning Boards have nothing whatever to do with the rights of minority religious groups. To impose such a restriction would be egregious overkill. In addition, the Government seeks that the Village remove James Montone from his position as a member of the Village Planning Board "effective immediately." Mr. Montone is not a party to this litigation. Indeed, he was not even a witness in this case. To invoke such a remedy against him without notice or an opportunity to be heard would clearly be in violation of his rights.

■ The zoning laws are, of course, required to be accommodating of religious exercises. Moreover, if the zoning laws make the exercise of religion inaccessible to practitioners they may amount to a violation of First Amendment rights. *Islamic Center*

*of Miss. v. Starkville, Miss.,* 840 F.2d 293 (5th Cir.1988). However, the Government's request for injunctive relief would eliminate any restriction upon home synagogues, which could literally be opened in every Orthodox house. First Amendment rights are not so all consuming, and the common good requires that some religious practices must yield. *United States v. Lee,* 455 U.S. 252, 258–59, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982). The free exercise of religion does not give worshippers a veto over government programs or regulations which do not *prohibit* free exercise of religion. *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 452, 108 S.Ct. 1319, 1327, 99 L.Ed.2d 534 (1987). A zoning code may require that a proposed church show that its use is compatible with the neighborhood, will not be detrimental to the health, safety and general welfare of the residents, and that the use will otherwise comply with the zoning code or a city's master plan. There is a strong interest in maintaining integrity of zoning schemes providing that they do not unduly impair the practice of religion. *Christian Gospel Church, Inc. v. City and County of San Francisco,* 896 F.2d 1221 (9th Cir.1990).[22]

■ Of course, a zoning regulation which has as its purpose the inhibition of the practice of religion may be unconstitutional on its face. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), 61 U.S.L.W. 4587. However, requirements limiting the construction of a house of worship do not necessarily restrict the practice of religion, which may be carried on in other locations. *Messiah Baptist Church v. County of Jefferson, Colo.,* 859 F.2d 820, 825 (10th Cir.1988) (noting that "building and owning a church is a desirable accessory of worship, not a fundamental tenet of the congregation's religious

---

**21.** For example, the Government proposes a definition of a residential place of worship in the following language:

An area located within a residence that is used for the conducting of religious services. It is the intent of this Local Law that the presence of pedestrians walking to and from religious services at a Residential Place of Worship shall not in and of itself constitute a

change in the residential character of the neighborhood.

**22.** That case also held that the exercise of free speech rights by homeowners and neighborhood associations to oppose zoning permits does not comprise a conspiracy—a major claim of the private plaintiffs in the *Sternberg* suit, which was rejected by the jury.

beliefs"). In this case there is evidence that the congregants have continued to assemble and worship even without approval of the Friedman synagogue and at other locations.

Appellate courts have specifically upheld zoning codes which prohibited the operation of Orthodox Jewish home synagogues which were located in a single family district. *Grosz v. City of Miami Beach, Fla.,* 721 F.2d 729, 741 (11th Cir.1983). There, the court balanced the cost to the government of making a zoning exception against the cost to the desired religious activity of conducting services in compliance with applicable zoning restrictions or relocating to a suitably zoned district. After noting that the zoning requirements were similar to regulations of place and manner of religious expression, which are permissible so long as the regulation is reasonable and there is no content classification, the court found the balancing test to favor the government. In *Grosz,* one-half of the city's residential zones were available for religious institutions. However, in other cases, zoning ordinances prohibiting construction of churches in residential neighborhoods have been upheld even though as little as 10% of the city was available for religious institutions. *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303 (6th Cir. 1983), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). (The Court in that case also noted that the building of a church was not a fundamental tenet of the religion ordinance did not prevent the practice of religion, but merely created an indirect financial burden.)

The desires of Orthodox Jews in the Town of Ramapo have been before this court in the past. In *Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803 (S.D.N.Y.1979), the late Judge Edward Weinfeld described the case as being essentially a local zoning dispute despite the variety of claims charging violation of the plaintiffs' federal statutory and constitutional rights. In *Weiss,* the plaintiffs were a congregation of Hasidic Jews who desired to establish a housing development on land in the Town of Ramapo and claimed, much as do the private plaintiffs here, that a civic association and its members conspired and acted to harass and delay their application to the zoning authorities to permit the proposed housing development. The complaint alleged no state or municipal activity and all of the defendants were private parties—which was the status of this case to the extent that it concerns events prior to the formation and operation of the Village of Airmont. As here, it was claimed that the Civic Association and its members acted jointly with the Town Supervisor, Herbert Reisman (who was originally a defendant in this action) to deprive the plaintiffs of their constitutional rights in a manner similar to that set forth here and dismissed earlier by the Court.

In addition to finding an absence of state action, Judge Weinfeld found

> other considerations of more compelling force require dismissal of the complaint. A fair reading of [the complaint's] allegations makes it clear that plaintiffs' claims under Sections 1982, 1983 and 1985(3) are inextricably bound up with the defendants' exercise of First Amendment rights of assembly, petition and association.

467 F.Supp. at 816. As in this case, the plaintiffs argued that the First Amendment rights of the defendants must be ignored since their real motivation was to pressure town officials and harass the plaintiffs. Judge Weinfeld rejected this argument stating that the protection of the First Amendment

> does not depend on "motivation"; it depends on the nature of defendants' conduct. Defendants' activities described in the complaint fall squarely under the protection of the First Amendment's guarantees of citizens' rights "peaceably to assemble and to petition the Government for a redress of grievances." (Footnote omitted.)

He concluded his decision holding:

> Plaintiffs by their pleading have sought to transmute a zoning dispute, still pending, into assorted claims of violation of federally protected constitutional rights. To uphold the complaint would, as Judge Waterman stated in a similar context, "be inviting every party to a state proceeding angered at delay to file a complaint in this

court reciting the history of his state case and concluding with a general allegation of conspiracy." Such was not the intendment or purpose of the civil rights acts. (Footnote omitted.)

467 F.Supp. at 818.

Ramapo's problems resurfaced in 1984 in the case of *Congregation Beth Yitzchok of Rockland, Inc. v. Town of Ramapo,* 593 F.Supp. 655 (1984). There, Judge Haight denied an Orthodox congregation's request for a preliminary injunction enjoining enforcement of zoning laws which interfered with the operation of its religious nursery school on a synagogue's premises. In a case similar to Rabbi Friedman's situation he held:

> The Court's task, accordingly, is to balance "the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Grosz v. City of Miami Beach, Florida,* 721 F.2d 729, 734 (11th Cir.1983).
>
> \*     \*     \*     \*     \*     \*
>
> The task is less delicate, however, where, as here, the law simply regulates a secular activity and, as applied to plaintiff, operates so as to make more practically difficult the practice of its religion. *Id.* In such cases, the burden on religion must be viewed as relatively less onerous.

\*     \*     \*     \*     \*     \*

Necessary to an assessment of the Town of Ramapo's interest in enforcing its zoning requirements is an understanding of exactly what regulations are involved. This has been, at least from the Court's perspective, an area of considerable confusion from the inception of this litigation. Much of the controversy between the litigants has evolved into a dispute over the nature of the regulations the Town seeks to impose and their applicability to plaintiff's premises. Plaintiff has consistently sought to characterize the dispute as involving the Town's insistence on compliance with relatively technical aspects of its zoning law, such as the control of "traffic patterns ... or congestion in the area" (Pl.Br. at 12) or "requirements relating to a setback" (Pl.Reply Br. of Feb. 24, 1984, at 4), and has argued that such concerns are minimal as applied to its small congregation, none of whose members are permitted to drive an automobile to services on the Jewish sabbath or religious holidays. In support of its argument, plaintiff cites to cases holding that a proposed religious use of property should be accommodated unless it is "convincingly shown that it will have a direct and immediate adverse effect upon the health, safety or welfare of the community." *Holy Spirit Association for Unification of World Christianity v. Rosenfeld,* 91 A.D.2d 190, 458 N.Y.S.2d 920, 922 (2d Dept.1983), quoting *Matter of Westchester Reform Temple v. Brown,* 22 N.Y.2d 488, 494, 293 N.Y.S.2d 297, 302, 239 N.E.2d 891, 895 (1968).

Plaintiff's argument depends, obviously, on the accuracy of its characterization of the ordinances involved. Defendant vigorously disputes this characterization and argues that health, welfare, and safety concerns are at issue here and represent a governmental interest sufficiently compelling to justify enforcement of its zoning law.

\*     \*     \*     \*     \*     \*

At a conference held before this Court, counsel for defendant agreed that use of the premises as a synagogue is a use permitted by right. However, although plaintiff would not be denied a certificate of occupancy because of its intended use of the premises, it would nevertheless be subject to compliance with the regulations set forth in the New York State Uniform Fire Prevention and Building Code.

\*     \*     \*     \*     \*     \*

With respect to the fire standards applicable to the building if used as a synagogue, nursery school, and residence, the governing statute is the New York State Uniform Fire Prevention and Building Code ("the Code"). (Wren Aff. of Feb. 1, 1984, ¶ 3). According to defendant, because plaintiff's building was initially constructed as a one-family dwelling, it is deficient in a number of ways with respect

to the mixed use contemplated. Citing to the Code, Assistant Building Inspector Wren avers that plaintiff would be required to submit a set of professionally prepared construction drawings demonstrating compliance with various fire-safety-related structural features, including, but not limited to, a fire-resistant wall between the garage and synagogue (*id.,* ¶ 5); a proper fire enclosure for the building's heating equipment (*id.,* ¶ 6); an approved means of egress from the synagogue and school area (*id.,* ¶ 7); and private emergency lighting, portable fire extinguishers, smoke and fire detectors, and a fire alarm system connected to Rockland County Communications Center (*id.,* ¶ 8). Plaintiff would also, according to Wren, be required to submit to the Town a fire evacuation plan and to conduct regularly scheduled fire drills.

If, in fact, these are the regulations applicable to plaintiff's premises, I would be loathe to grant the injunctive relief plaintiff seeks in the face of alleged noncompliance with unquestionably important safety requirements.

\* \* \* \* \* \*

Having determined that certain fire and safety-related regulations are, contrary to plaintiff's view, at issue here, I must conclude that public safety, health and welfare is at least one objective underlying the Town's interest in enforcing the challenged ordinance. Such an interest is of a magnitude to justify even substantial inroads on the free exercise of religion and clearly outweighs the indirect and seemingly remediable burden on plaintiff's religious liberty. "[W]hile the freedom to harbor religious beliefs is absolute, the freedom to engage in religious practices is not.... [Such] practices are subject to regulation for the protection of society." *Rosenfeld, supra,* 458 N.Y.S.2d at 925.

593 F.Supp. at 659–63.

This court adopts Judge Haight's reasoning, particularly as it applies to the Friedman synagogue. Consequently, for all of the foregoing reasons, the Government's application for injunctive relief against the Village and its Trustees is in all respects denied. The

Government's action against the defendants is dismissed. The clerk will enter judgment on behalf of the defendants.

SO ORDERED.